Stotler v. Rochelle.

MARY E. STOTLER, *Appellee,* v. H. L. ROCHELLE *et ux.,*
*Appellants.*

No. 16,631.

SYLLABUS BY THE COURT.

NUISANCE — *Cancer Hospital — Location — Injunction—Parties.*
The establishment of a cancer hospital in a residence neigh-
borhood, in near proximity to dwellings, may be enjoined at
the instance of one owning and occupying adjacent property.

Appeal from Wyandotte court of common pleas.
Opinion filed July 9, 1910.   Affirmed.

*James T. Cochran, W. A. Morris, J. A. McLane,* and
*L. W. Keplinger,* for the appellants.

*James F. Getty, F. D. Hutchings,* and *David F. Car-
son,* for the appellee.

The opinion of the court was delivered by

MASON, J.:  A hospital for the treatment of patients
afflicted with cancer was about to be established in
Kansas City, Kan., in a building formerly used as a
dwelling house.  The owner and occupant of adjacent
premises brought an action to enjoin its establishment,
upon the ground that in view of the character of the
neighborhood its presence there would render it in
legal contemplation a nuisance.  A permanent injunc-
tion was granted, and the defendants appeal.

The home of the plaintiff is seventy-eight feet from
the main building which it is proposed to use as a hos-
pital.  The two houses face in the same direction, and
each has a number of windows looking toward the
other.  A fifteen-foot alley runs between them, near
which is a small building belonging to the hospital
property, formerly used for a billiard room.  Two other
residences are situated about ninety feet from the hos-
pital building, and three others at a distance of about
150 feet.  All the houses in the vicinity are used solely
as dwellings.

Witnesses for the plaintiff who were familiar with real-estate values testified that in their judgment the establishment of the hospital would cause a material depreciation in the rental and market value of the surrounding property. Several physicians expressed the opinion that there would be some danger of the communication of the disease through transmission by means of insects and perhaps in other ways. There was also evidence that offensive odors resulting from the disease itself, and from disinfectants used on account of it, might reach the occupants of neighboring dwellings. On behalf of the defendants there was testimony that none of the anticipated evils had resulted from a cancer hospital formerly maintained by them under somewhat similar conditions; that under proper management there need be no offensive odors about such a place; and that cancer is not contagious or infectious. Perhaps the court may take notice of the prevailing view in the medical profession upon the last proposition. From the current literature of the subject it appears that while it has not been proved to the satisfaction of the profession generally that cancer can be communicated from one individual to another, except by the process of grafting or transplanting cancerous tissue, competent investigators are not lacking who believe that it is of parasitic origin and in some degree infectious. That theory is presented and argued at length in an address published in The Lancet of January 11, 1908 (pp. 80-85), to which is appended a bibliographical note. Results of experiments tending to support the theory are recorded in the issues of June 5, 1909 (pp. 1591-1593), and April 9, 1910 (pp. 990-992). An article in the same publication (December 4, 1909, pp. 1709-1711) describes observations made in Paris covering a period of two years and a half, which lend color to the popular belief in the existence of "cancer houses"—that is, houses the occupants of which are peculiarly subject to cancer. In the present state of

accurate knowledge on the subject it is quite within bounds to say that, whether or not there is actual danger of the transmission of the disease under the conditions stated, the fear of it is not entirely unreasonable.

It is of course not necessary that the use to which property is put shall be unlawful in itself in order to constitute it a nuisance in the eye of the law. (29 Cyc. 1160; 21 A. & E. Encycl. of L. 692.) Whether in a given case the obligation so to use one's own property as not to injure another's has been or is about to be so far transgressed as to justify the interference of a court is a question to be determined as a matter of reason, fairness and justice under all the circumstances. The injury need not extend beyond annoyance, if in view of all the facts it is unreasonable. For instance, offensive odors, although not injurious to health, have often been held to constitute sufficient ground for injunction.

The general considerations upon which the line is to be drawn between annoyances that can be restrained and those which must be endured are thus stated in *Barnes v. Hathorn,* 54 Maine, 124:

"What is a nuisance? In considering this question, when the complaint is based upon the use of another of his own property, we are first met by the general doctrine of the right of every man to regulate, improve and control his own property; to make such erections as his own judgment, taste or interest may suggest; to be master of his own, without dictation or interference by his neighbors. On the other hand, we meet that equally well-established and exceedingly comprehensive rule of the common law—'*sic utere tuo, ut alienum non laedas*'—which is the legal application of the gospel rule of doing unto others as we would that they should do unto us. The difficulty is in drawing the line in particular cases, so as to recognize and enforce both rules, within reasonable limitations. It is quite clear that the law does not recognize any legal right in anyone to compel his neighbor to follow his tastes, wishes or preferences, or to consult his mere convenience. He can not dictate the style of architecture or, generally,

Stotler v. Rochelle.

the location of the buildings—or maintain that an unsightly or ill-proportioned edifice is a nuisance because it offends his eye, or his too cultivated taste. Nor can he interfere because he has idle and unfounded fears of ill effects from the use of the adjoining lot. There may be many acts which, to the eyes of others, appear to be unneighborly and even unkind, and entirely unnecessary to the full enjoyment of the property—vexatious and irritating, and the source of constant mental annoyance, and yet they may be but the legal exercise of the right of dominion, and therefore can not be deemed nuisances. The diminution of the market value of adjacent buildings, by such use, will not of itself make it a nuisance. But there is a limit to such right. No man is at liberty to use his own without any reference to the health, comfort or reasonable enjoyment of like public or private rights by others. Every man gives up something of this absolute right of dominion and use of his own, to be regulated or restrained by law, so that others may not be hurt or hindered unreasonably in the use and enjoyment of their property. This is the fundamental principle of all regulated civil communities, and without it society could hardly exist, except by the law of the strongest. This illegal, unreasonable and unjustifiable use to the injury of another, or of the public, the law denominates a nuisance." (p. 125.)

The same thought runs through the discussion of the subject by the text-writers, as shown by the following typical expressions:

"It is not practicable to give other than a general definition of what constitutes a nuisance. A precise, technical definition, applicable at all times to all cases, can not be given, because of the varying circumstances upon which the decisions are based. . . . One of the great difficulties in defining a nuisance technically is to describe the degree of annoyance necessary to cause the actionable injury. . . . It is difficult to define just what degree of injurious influence must be reached in order to warrant the court in determining what circumstances constitute a nuisance. . . . The determination, however, of the question rests in sound judgment and depends upon common sense in each case. . . . Even that which causes a well-founded, reasonable apprehension of damage may be a nuisance." (Joyce, Law of Nuis. §§ 1, 19.)

"Thus a business or erection which should be located in a remote locality may be a nuisance merely because located in a residence or populous neighborhood." (21 A. & E. Encycl. of L. 692.)

"The locality is to be considered in determining whether there is a nuisance, for what might be a nuisance in one locality might not be so in another." (29 Cyc. 1157.)

"A hospital is not a nuisance *per se,* or even *prima facie;* but it may be so located and conducted as to be a nuisance to people living close to it. Even a pesthouse is not a nuisance *per se,* although it may be a nuisance where it is . . . situated near to property used or suitable for residence purposes." (29 Cyc. 1175.)

"The locality, the condition of property, and the habits and tastes of those residing there, devested of any fanciful notions, or such as are dictated by 'dainty modes and habits of living,' is the test to apply in a given case. In the very nature of things there can be no definite or fixed standard to control every case in any locality. The question is one of reasonableness or unreasonableness in the use of property, and this is largely dependent upon the locality and its surroundings." (1 Wood on Nuis., 3d ed., § 9.)

Cases bearing more or less directly on the question involved are collected in a note in 15 Ann. Cas. 719.

In *Deaconess Hospital v. Bontjes,* 207 Ill. 553, an injunction against the maintenance of a hospital close to dwelling houses was sustained, the court saying:

"It is said that a screen may be erected between the two properties, and that the windows of the hospital may be kept closed and the curtains drawn on the side next the property of appellee. It is manifest that in the summer time the windows must be opened and the curtains drawn aside in both buildings for ventilation; and it is equally apparent that the screen would not prevent the cries of the suffering, the moans of the dying and other offensive noises being heard in the home of the appellee; nor would such an obstruction entirely prevent the transmission of the smell of iodoform, ether and other offensive substances; nor would the annoyance resulting from the frequent visits of the

Stotler v. Rochelle.

hearse and the ambulance to the hospital be materially lessened by the proposed precautions. The work in which appellant is engaged is philanthropy of the highest order, but the law will not permit it to be conducted in such a manner that it becomes an intolerable nuisance to those who are in nowise responsible for its location and operation." (p. 560.)

In *Baltimore City v. Fairfield Imp. Co.*, 87 Md. 352, an injunction against the placing of a leper for care and restraint in a residence neighborhood was justified in part upon grounds thus stated in the opinion:

"Leprosy is, and always has been, universally regarded with horror and loathing. . . . The horror of its contagion is as deep-seated to-day as it was more than two thousand years ago in Palestine. There are modern theories and opinions of medical experts that the contagion is remote and by no means dangerous; but the popular belief of its perils founded on the Biblical narrative, on the stringent provisions of the Mosaic law that show how dreadful were its ravages and how great the terror it excited, and an almost universal sentiment, the result of a common concurrence of thought for centuries, can not in this day be shaken or dispelled by mere scientific asserration or conjecture. It is not, in this case, so much a mere academic inquiry as to whether the disease is in fact highly or remotely contagious; but the question is whether, viewed as it is by the people generally, its introduction into a neighborhood is calculated to do a serious injury to the property of the plaintiff there located." (pp. 364, 365.)

Much the same reasoning may be applied here. The question is not whether the establishment of the hospital would place the occupants of the adjacent dwellings in actual danger of infection, but whether they would have reasonable ground to fear such a result, and whether, in view of the general dread inspired by the disease, the reasonable enjoyment of their property would not be materially interfered with by the bringing together of a considerable number of cancer patients in this place. However carefully the hospital might be conducted, and however worthy the institution might

be, its mere presence, which would necessarily be mani-
fested in various ways, would make the neighborhood
less desirable for residence purposes, not to the over-
sensitive alone, but to persons of normal sensibilities.
The court concludes that upon these considerations the
injunction was rightfully granted.

The plaintiff, as the owner and occupant of adjacent
property, has such a peculiar interest in the relief
sought as to enable her to maintain the action.

The judgment is affirmed.