[No. 29774.   Department One.   March 25, 1946.]

ROBERT H. PARK *et al., Respondents,* v. RALPH M. STOLZHEISE
*et al., Appellants.*[1]

[1]Reported in 167 P. (2d) 412.

*Lewis L. Stedman,* for appellants.

*Chavelle & Chavelle,* for respondents.

STEINERT, J.—Plaintiffs instituted in the superior court for King county an action seeking to enjoin the defendants from violating the provisions of a certain zoning resolution previously recommended and adopted by the King county planning commission and the board of county commissioners of that county, and, further, to enjoin the defendants from conducting, operating, and maintaining a sanitarium for mental cases upon certain real property located within the area covered by the zoning resolution. Ten additional parties intervened in the action, seeking the same relief. Defendants answered, admitting in part, but for the most part denying, the material allegations in the several complaints and, in addition, setting up an affirmative defense, the allegations of which were in turn denied by the plaintiffs in their reply. The cause was tried to the court without a jury, and, after a trial covering a period of nine days, a

decree was entered granting the relief sought. Defendants appealed.

Appellant Ralph M. Stolzheise, to whom we shall here-inafter refer as though he were the sole appellant, is a physician and surgeon specializing in neuropsychiatry, including the treatment and care of persons suffering from mental ailments. For some time prior to May 8, 1944, appellant had been considering, and was desirous of consummating, a purchase of property that could be used for the "care, treatment, and education of individuals who show symptoms of impending mental breakdown." Through the efforts of an experienced real-estate broker, his search was directed to a tract of land consisting of about seven and one-half acres adjacent to Marine View road and fronting on Puget Sound, near Zenith, which is about twelve miles south of the south city limits of Seattle. This tract, which was then owned by Eigil Buschmann and his wife, Nora Buschmann, has a water frontage of four hundred feet, and constituted a country estate, having upon it a large manor house of ten or twelve rooms, a guest house, a barn, chicken houses, and other structures. A sizeable stream runs through the land, and the buildings are supplied with water through a connected pumping system. The premises were improved with lawns, shrubbery, and flowers, and commanded an unobstructed view of the Sound to the north and to the south. The place had been occupied by the Buschmanns as a home for about eighteen years and was considered one of the show places of western Washington. Mr. Buschmann had at times maintained thereon deer, pheasants, and an assortment of fine chickens.

Extending along the water front for considerable distances in both directions from the Buschmann property are many elegant residences which had been constructed at considerable cost during the intervening years. Among these are several that were valued at thirty thousand dollars or more, and many that were worth in excess of ten thousand dollars. The general community is easily accessible over well-improved roads leading from and to the city of Seattle, and at the same time is highly desirable for the establish-

ment of substantial permanent homes; it is peculiarly adapted for settlement and use by families having young children.

Departing for the moment from the factual thread of events, and for the present turning our attention to what may be called the legal background of those events, we shall at this point refer to the zoning law and regulations which underlie this controversy.

In 1935, the legislature enacted chapter 44, Laws of that year, p. 115 (Rem. Rev. Stat. (Sup.), § 9322-1 [P. P. C. § 776-1]. *et seq.*), authorizing the creation of planning commissions by cities, towns, and counties, and empowering such creative municipalities to adopt and enforce co-ordinated plans, prepared by their respective commissions, for the physical development of the municipality. For that purpose, and to the extent deemed reasonably necessary or requisite in the interest of health, safety, morals, and the general welfare, the city council or the board of county commissioners of the creating municipality was authorized to adopt general ordinances or general resolutions, recommended by its commission, regulating and restricting the location and use of buildings, structures, and land for residence, trade, industrial, and other purposes. The act further authorized the municipality, on recommendation of its commission, to divide its area, or any part thereof, into as many districts as it deemed suitable for the purposes of the act and to regulate and restrict within such districts the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land, all of such regulations to be devised as parts of a comprehensive plan which was to be prepared by such commission for the physical and other generally advantageous development of the municipality, and designed to encourage the most appropriate use of land throughout the municipal territory.

Pursuant to the legislative act of 1935, the board of county commissioners of King county, on June 2, 1937, adopted "General Resolution Number 6494" establishing land classifications and districts within the unincorporated territory of King county, regulating the uses of property therein,

adopting a map dividing the county into areas, and providing for the adoption of individual sectional area district maps showing classified use districts.

Section 1 of the resolution provides:

"For the public health, safety, morals and general welfare, and in order (1) to secure for the citizens of King County the social and economic advantages resulting from an orderly planned use of the land resources within the County; (2) to regulate and restrict the location and use of buildings, structures and land for residence, trade, industrial and other purposes. . . .; (3) to provide definite official land use plans for property publicly and privately owned within King County; and (4) to guide, control and regulate the future growth and development of said County in accordance with said plans, there is hereby adopted and established official Districting Plans for King County pursuant to the authority of Chapter 44, Laws of Washington for 1935."

In order to classify, regulate, restrict, and segregate the uses of land, buildings, and structures, § 3 of the resolution divides the unincorporated territory of King county into various classes of use districts denominated, respectively, residence, suburban, agricultural, business, commercial, manufacturing, industrial, forestry, forestry recreational, watershed, landing field, and *unclassified* districts. In the present action, we are concerned with only three of these classifications, designated R-1 (residence), R-3 (residence), and U-1 (unclassified) districts. Classification R-1 does not permit the land so classed to be used for hospitals and sanitariums; classification R-3, however, does permit such uses, as does also classification U-1, to which we will more particularly refer a little later herein.

Other subdivisions of § 3 provide that the boundaries of such use districts shall be determined and defined from time to time by the adoption of sectional area district maps covering portions of the county, each of which sectional area district maps shall be, upon its final adoption, a part of the official master plan of the county; also that each sectional area district map, after its final adoption, shall be and become a part of resolution No. 6494, and such map and all

information shown thereon shall be as much a part of the resolution as if they were fully described therein; and that the boundaries of such use districts as are shown upon any adopted sectional area district map are thereby likewise adopted as part of the original resolution, and the regulations prescribed by the resolution governing the uses of land, buildings, and structures are declared to be effective as to all land included within the boundaries of each and every use district shown upon each of such sectional area district maps.

Section 4 of the resolution provides:

(1) "All the unincorporated territory of King County, including the National Forest and all publicly and privately owned land therein is hereby designated and established as a U-1 (Unclassified) District and shown on a map divided into sectional areas numbered from 1 to 65 inclusive, which said map is hereby adopted, made a part of this resolution, and designated Area District Map of King County, Washington.

(2) "Except as provided in Section 19 (p. 18) of this resolution, any land, building, structure or premises in the U-1 (Unclassified) District may be used, occupied or maintained *for any purpose*." (Italics ours.)

Section 19, referred to in subd. (2) just quoted, relates to unclassified district regulations and permits any use in such districts not otherwise prohibited by law nor falling within certain specified exceptions, none of which is material here. However, § 5 of the resolution, headed "ADOPTING SECTIONAL AREA DISTRICT MAPS," must be read in connection with § 4. Section 5 (1) reads as follows:

"When a map of a sectional area district of King County or portion thereof is duly adopted by resolution of the Board it is made a part of *this resolution* as a subsection of Section 4 hereof and *amends said Section*. Each sheet of each sectional area district map, or each sheet of any portion thereof, including each index sheet, shall be a sub-subsection of Section 4 hereof." (Italics ours.)

Section 22 provides that the lawful use of land or buildings, existing at the time of the passage of the resolution, may be continued, except in residence and certain other

specified districts, and that such privilege shall also apply to nonconforming uses in districts subsequently changed.

Section 25 reads as follows:

"The Planning Commission shall, as rapidly as is, in its judgment, feasible, proceed with the *more precise classification of the unincorporated territory* of King County in accordance with the provisions of the statutes of the State of Washington relating to such matters, and shall hold such public hearings as are prescribed in the manner directed by such statutes." (Italics ours.)

Finally, § 26 provides that, whenever the owner of any land or building desires a reclassification of his property, he shall present to the board a petition requesting an amendment, supplement, or change of regulations prescribed for such property, whereupon the petition shall be referred to the planning commission for investigation and report as to whether such change is necessary for the preservation and enjoyment of any substantial right of the petitioner and not materially detrimental to the public welfare or the property of other persons located in the vicinity of the property sought to be reclassified. The petition may, after investigation and hearing, be approved or disapproved by the commission, or, upon appeal, by the board.

So far as this case is concerned, the material provisions of the resolution as set forth above may be summarized generally as follows:

General resolution No. 6494, establishing land classifications and districts within the unincorporated territory of King county and regulating the uses of property therein, was adopted to promote the public health, safety, morals, and general welfare, and to secure for the citizens of the county the advantages resulting from an orderly planned use and regulation of the land resources within such territory. To that end, the uses of land and buildings within the unincorporated territory of the county were classified according to fourteen specified types of use, including among them R-1 (residence) and R-3 (residence), and one indeterminate, unspecified, unclassified type of use designated U-1 (unclassified); and for that purpose the unincorporated

territory of the county was to be divided into use districts, each to be determined by its own peculiar type of use, as indicated above. The boundaries of the various use districts were to be determined and defined from time to time by the adoption of sectional area district maps, showing the classifications and boundaries of the use districts established therein, and upon the adoption of such sectional area district maps they were to become parts of the county's official master plan and also of resolution No. 6494.

Proceeding upon that basis, the resolution first established and designated *all* of the unincorporated territory within the county as a U-1 (unclassified) district as shown upon a map concurrently adopted and designated "Area District Map of King County." At the same time, the planning commission of the county was by the resolution directed to proceed, as rapidly as was feasible, with a more precise classification of the unincorporated territory, in accordance with the various types of use referred to above. The more precise classifications were to be evidenced by sectional area district maps, which, when adopted by the board, were, as stated above, to become parts of the master plan of the county and of the resolution as originally adopted. Any lawful use of land or buildings existing at the time of the passage of the resolution, even though such original use did not subsequently conform to the provisions of the resolution, may be continued, except in residence districts. R-1 (residence district) does not include hospitals or sanitariums as conforming uses; R-3 (residence district), however, does include such uses, and U-1 (unclassified district), of course, by its generality, also includes them.

Whenever the owner of any land or building desires a reclassification of his property, he may present to the board his petition requesting such action, whereupon the petition shall be referred to the planning commission for investigation and report as to whether or not such change is necessary for the preservation and enjoyment of the petitioner's property rights and as to whether or not such change will be materially detrimental to the public welfare and the property of other persons in the vicinity. The planning

commission may, after investigation and report, either recommend or disapprove such change, and, upon appeal to the board of county commissioners, that body may approve or disapprove such report.

With this understanding of the provisions of the general resolution, we resume our statement of the facts pertaining to this particular case.

Prior to August, 1944, the area in which the Buschmann property is located had never been zoned, or classified, as anything other than U-1 (unclassified district). However, the planning commission had for a long time been contemplating a "more precise classification" and zoning of a large sectional area which included that property, and in fact had prepared a sectional area district map preliminary to a more precise classification and had given public notice of a hearing to be held concerning such classification. On that map, the Buschmann property was, at the initial request of the appellant and Buschmann, and during the transpiration of the events now being narrated, tentatively zoned as R-3, which would permit use of the property as a sanitarium. It was understood, however, that this tentative classification was subject to further consideration by the planning commission.

While the matter was in this general state of progress, appellant, being desirous of acquiring the Buschmann property for the purposes stated above, on May 8, 1944, entered into an agreement with Buschmann, as evidenced by an earnest money receipt of that date. That instrument recited that appellant had made a cash payment of one thousand dollars on the purchase price of the property, the total amount of which was $31,500; that $25,000, including the initial deposit, of the total purchase price was to have been paid at the time of closing the transaction on or about May 25th; that the balance of $6,500 was to be paid on July 15, 1944, before taking possession; and that possession was to be had on or before August 1, 1944. On May 24, 1944, Buschmann and wife executed to the appellant and his wife a warranty deed to the property; the deed was not recorded, however, until June 5, 1944.

In the meantime, on June 1st, the proposal of the planning commission to zone a large area in which the Buschmann property is located came on for hearing at the Federal Way school. On that same day, appellant and Buschmann signed a petition to have the property here in question zoned as R-3 in order to permit the establishment thereon of a convalescing sanitarium. The petition recited that the army and navy were already releasing thousands of men who were in need of a convalescing sanitarium and that there would be thousands more as the war continued and also after the war. The meeting was attended by many people, but no formal or final action was taken at that time.

Other meetings of the citizens of the community were subsequently held at various times during the next three weeks. Those meetings were attended by the appellant, who endeavored to explain to the property owners present the nature and character of the institution which he proposed to establish on the premises. He stated that his "guests," or patients, would be of the neurotic, and not of the psychotic, type; that the institution was designed for the purpose of taking care of nervous and mental cases that required rest and recuperation; and that his method of operation would be to allow the patients to mingle in the community, thus providing them a means for adjustment and rehabilitation. A number of witnesses who had attended the meetings testified that, throughout his extended explanations, the appellant stated that the patients he would take would be borderline cases, and not of the violent type, but that if any of them should become violent his assistants or employees could easily restrain them, or else such patients would be taken away. They further testified that appellant stated that he proposed to erect upon the premises additional guest houses to accommodate in all thirty or forty patients.

Needless to say, appellant's explanations did not allay the fears that had already arisen in the minds of the many resident property owners, but only served to intensify their alarm. As a result, a great amount of opposition to the plan immediately developed in the community, and this soon

took the form of an animated protest and a determined effort to prevent any zoning of the premises that would permit the establishment of the sanitarium.

At a meeting held by the planning commission in the County-City building in Seattle on June 20, 1944, following the adjourned meeting of June 1st, there were many people present, including various property owners on the one side and the appellant on the other. Both sides were represented by their counsel who have appeared in this action. The minutes of that meeting show that a petition of protest against appellant's proposal was there filed, bearing the names of 219 residents of the community; also that approximately forty objectors were present at the hearing and stood in protest. Arguments were presented by counsel and various individuals, including the appellant. In the minutes of that meeting appears this statement with reference to appellant's explanations:

"Dr. Stolzheise, upon being asked to tell of his plans, said he wishes to operate a private sanitarium for nervous and mental patients who are unable to adjust themselves to normal living and business activities; it might be called a 'school of life' where such unfortunate individuals will be taught to become happy useful citizens. 'There would be no patients who do not come voluntarily and remain voluntarily', the doctor said, the same as going to consult him in his office. He cares for the more acute cases at the Gardner Sanitarium north of the city. He plans some additional landscaping at the east end of the Buschmann grounds which with the Sound at the west, will make it a secluded and ideal spot for his purpose."

On July 18, 1944, the planning commission at a regular session rejected appellant's petition to zone his property as R-3, or third residence, to permit its use as a sanitarium, and by formal resolution approved the district zoning map of the Des Moines-Zenith district, which included the property here in question, classifying it as R-1, first residence. Appellant was immediately notified of such action. On July 31st, the board of county commissioners formally approved and adopted the resolution and recommendation of the commission.

In the meantime, between June 1st and July 31st, appellant had been by no means idle, but, on the contrary and despite the opposition on the part of the residents of the community, had been busily engaged in completing the transaction with Buschmann and perfecting his plan to convert the premises into a sanitarium and operate the property as such. By June 5th, when the deed from Buschmann was recorded, appellant had paid the full amount of the purchase price with moneys derived from two mortgages which he had placed on the property. He had also received tentative assurance from one of the members of the planning commission that the property would be zoned as R-3, although it is not contended that the act of one member would bind the entire commission.

Immediately after his deed was recorded, appellant employed architects, who prepared drawings and plans for remodeling and altering the buildings on the premises and constructing new buildings, making provision for housing facilities for appellant, his family, and his staff of assistants, as well as quarters for thirty or forty patients, who were to occupy the guest house already on the premises and other similar structures to be erected.

Through one of the architects and the one member of the planning commission referred to above, appellant, on June 16, 1944, obtained a King county building permit for altering the existing structures and erecting additional guest houses at an estimated cost of thirteen thousand dollars. The permit bore a prominent "NOTICE" on its face, however, that it was subject to the provisions of resolution No. 6494, regulating zoning. On July 6, 1944, appellant obtained from the United States war production board authority to begin construction, and about the same time he entered into a contract with a construction company which was to do the alteration work. Such alteration work was begun on July 25th, which was six days after appellant had been notified by the planning commission that his petition for zoning the property as R-3 had been rejected and that the property was to be zoned as R-1. At the direction of the appellant, the work was confined to the alteration of the existing guest

house, and that work was completed September 16, 1944, long after the board of county commissioners had approved the action taken by the planning commission.

On July 26th, the Buschmanns surrendered possession of the property, and on the next day appellant moved in with his family and *one* guest, or patient. This, it will be observed, was a few days before the final action taken by the board of county commissioners, on July 31st, and also a few days before the expiration of the time set in the earnest money receipt for surrender of possession by the Buschmanns.

It appears from appellant's own testimony that the guest house intended for patients has been occupied by only two such persons and that these were placed there after this action was begun and only a short time before the trial. Until that time, appellant apparently took care of his patients, one or two in number, in the house occupied by him and his family.

The factual issues in the case, as presented by the evidence at the trial, revolved around questions as to the character of the property in the immediate and general vicinity of the Buschmann property recently acquired by appellant; also, as to whether such surrounding properties would be depreciated in value by the establishment of a sanitarium for mental cases on the Buschmann property; and, further, as to whether the maintenance of such institution would destroy the peace, repose, and tranquility of the complaining property owners by producing a condition of fear among them for the safety and security of themselves and their children. There was voluminous testimony upon all of these questions, and, in our opinion, the great preponderance thereof fully substantiated the contentions and claims of the respondents. It would be unprofitable, and well-nigh impossible, to set forth the evidence at length. Our view of it coincides with that of the trial court as expressed in the following statement:

"The great preponderance of all the evidence in this case is to the effect that the property in question, as well as the water front property in this vicinity, is strictly residential,

and of the highest and first class and that to permit the conversion of defendant's [appellant's] property into a sanitarium would materially depreciate the value of the property in this community. That to do so would destroy the peace, repose, tranquility and comfortable enjoyment which the property owners in this district have enjoyed for many years, and produce in its stead a very disturbing feeling of fear for their safety and security.

"The real estate agent of the defendants who was instrumental in securing this property for the defendants was called as a witness for and by the defendants and testified that this is one of the best residential districts in the county.

"It would seem that it is within the ordinary knowledge of mankind that the creation, maintenance and operation of a sanitarium for the care and treatment of persons suffering from mental breakdown in a district suitable and used for residential purposes would decrease the value of surrounding property. Certainly no one possessing the sensibilities of the ordinary being would take up a residence in this vicinity as long as other places were obtainable. . . .

"It is a matter of common knowledge, I think, that even among the most eminent psychiatrists and those skilled and specializing in nervous and mental disorders and diseases, there is very frequently a difference of professional opinion as to whether or not an individual is sane or insane; whether he can distinguish between right and wrong; and whether he is or is not safe to be at large.

"If, therefore, there is this difference of opinion among those skilled in the profession, can this court say that the fear expressed by a layman for his safety and that of his family is unfounded or imaginary?"

The principal legal question in this case is whether, under the facts as above stated, the neighboring property owners are entitled to an injunction against the threatened use of the property here in question, or whether, on the contrary, the purchaser of that particular property is entitled to the use of it for the purpose for which it was acquired, on the theory that he established an existing use prior to the final adoption of the zoning resolution.

It is now generally held by the courts in this country that a property owner may pursue the remedy of injunction against the violation of a zoning ordinance, upon a showing

of special damages to him by way of diminution in value of his property resulting from the violation of the ordinance. Notes, 129 A. L. R. (1940) 885, where the cases are collected.

Appellant does not dispute that principle, but contends, rather, that his rights became vested *before* the particular zoning resolution of July 31, 1944, had come into effect. He does not now claim any rights under an R-3 classification, nor could he do so, for his petition in that respect was never granted, but was officially rejected. His real claim is founded upon an alleged original U-1 classification of his property, which under §§ 4 and 19 of resolution No. 6494 might appear, upon a casual reading, to entitle him to use, occupy, and maintain the property *for any purpose.* Appellant is, of course, in no better position than Buschmann himself would have been had he retained title to the property and then had done exactly the same things that appellant did *after* he purchased it.

As has been stated above, when the original resolution was adopted in 1937, *all the unincorporated territory of King county* was first designated and established as a U-1 (unclassified) district, but with an accompanying direction to the planning commission to proceed as rapidly as feasible with *a more precise classification* of the unincorporated territory of the county. By the same resolution, it was provided that the boundaries of the various use districts as therein classified, according to types of use, should be determined and defined from *time to time* by the adoption of sectional area district maps, and that when so adopted such maps and all information shown thereon should be parts of the official master plan of the county and as much a part of the *original resolution* as if all such matters were fully described therein.

The original resolution was adopted pursuant to the provisions and requirements of the statute enacted in 1935, and therefore both Buschmann and the appellant had constructive notice of the provisions and permissive extent of that resolution. They also had actual knowledge of the fact that the planning commission was contemplating, and had already taken the initial steps preparatory to, a "more

precise classification" of the lands in that particular vicinity, under the authority conferred upon the commission by the statute and the parent resolution. They knew, of course, the residential character of the neighboring property, and they were definitely cognizant of the practically universal effort that was being made to prevent the establishment of the contemplated institution. By endeavoring to obtain an R-3 classification of the property, which would permit use thereof as a sanitarium, appellant and Buschmann themselves recognized the power resting in the commission to lift the property out of its original undefined, indefinite, and uncertain classification of U-1 and place it in a classification to which it really belonged.

This case does not present a situation where a property owner, prior to the enactment of a particular zoning ordinance or resolution, has definitely established a particular use of his property and long devoted that property to a use which, under the zoning regulation, would otherwise not be permissible. On the contrary, this instance represents a situation where a property owner, or his predecessors, having long used certain property for strictly residential purposes, suddenly concludes to use it for a purpose forbidden by its natural classification and, in an endeavor to circumvent its rightful classification before proceedings instituted to that end can be concluded, makes partial preparation of the premises for future use on an enlarged scale and for a purpose detrimental to the public welfare and to the property of other persons located in the vicinity thereof.

■■ Upon the facts presented by the evidence in this case, we are clearly of the opinion that appellant had not, prior to July 31, 1944, when the property was zoned as R-1 (residence), established a sanitarium or a use of the premises for that purpose, within the purview of the terms of resolution No. 6494. We are also of the opinion that, although appellant's property was at the time of the enactment of that resolution classed, generally, with all other property in the unincorporated territory of King county, as U-1 (unclassified), the resolution did not confer upon appellant,

or his predecessors, a vested right to use that property forever for any purpose he might desire, but, rather, that the commission, with the approval of the board of county commissioners, had the right, under the facts shown by this case, to classify the property together with that in the neighboring vicinity as an R-1 (residence) district.

But wholly aside from the provisions of zoning resolution No. 6494 and any rights which appellant may seek to claim thereunder, there are certain well-settled principles of law which would deny appellant the right to use this property as a sanitarium for the purposes intended.

While every person has a right to do with his property as he sees fit, that right can be exercised only so long as he does not, and in such a manner as will not, invade the rights of his neighbor unreasonably, as judged by the ordinary standards of life, according to the notions and habits of people of ordinary sensibilities. The maxim, *sic utere tuo ut alienum non laedas,* expresses the well-established doctrine of the law. That principle has been further developed in this state by statutes relating to nuisances. Rem. Rev. Stat., § 9914 [P. P. C. § 81-23], declares:

"Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, . . . or in any way renders other persons insecure in life, or in the use of property."

This court has had many occasions to apply the general doctrine, as further developed by the nuisance statute, to situations closely analogous to the one here. In the case of *Everett v. Paschall,* 61 Wash. 47, 111 Pac. 879, Ann. Cas. 1912B, 1128, 31 L. R. A. (N.S.) 827, this court directed the entry of a decree enjoining the maintenance of a tuberculosis hospital in a residential section of a city, where it appeared that local fear and dread of the disease was such that it substantially depreciated the value of adjacent property and interfered with the comfortable enjoyment thereof, disturbing the minds, nerves, and sleep of the occupants. The court said:

"Waiving for the present the substantial pecuniary dam-

age which the court found to exist, and addressing ourselves to the principle underlying the lower court's decree—that is, that the danger being only in the apprehension of it, a fear unfounded and unsustained by science, a demon of the imagination—the courts will take no account of it; if dread of the disease and fear induced by the proximity of the sanitarium, in fact, disturb the comfortable enjoyment of the property of the appellants [adjoining property owners], we question our right to say that the fear is unfounded or unreasonable, when it is shared by the whole public to such an extent that property values are diminished. The question is, not whether the fear is founded in science, but whether it exists; not whether it is imaginary, but whether it is real, in that it affects the movements and conduct of men. Such fears are actual, and must be recognized by the courts as other emotions of the human mind. That fear is real in the sense indicated, and is the most essentially human of all emotions, there can be no doubt."

Defining "comfortable enjoyment" to mean mental quiet as well as physical comfort, the opinion quoted from a comment made by the editor of the American Law Review analyzing the decision of the supreme court of Kansas in *Stotler v. Rochelle,* 83 Kan. 86, 109 Pac. 788, in part as follows:

"However carefully the hospital might be conducted, and however worthy the institution might be, its mere presence, which would necessarily be manifested in various ways, would make the neighborhood less desirable for residence purposes, not to the oversensitive alone, but to persons of normal sensibilities." 44 American L. Rev. 759.

All that was said in the *Paschall* case, *supra,* and in the learned editor's comment, as above quoted, could be applied with equal emphasis to the instant case.

In *Densmore v. Evergreen Camp No. 147, Woodmen of the World,* 61 Wash. 230, 112 Pac. 255, it was held that the maintenance of an undertaking establishment in the residence portion of a city, within a few feet of residences, while not a nuisance *per se,* may nevertheless be enjoined as a nuisance, where it appears that noxious odors and gases will permeate the nearby residences and there is danger of infection and contagion. That case, because of its peculiar

facts, is not wholly comparable to the case at bar, but we cite it for the reason that it quotes approvingly from *Cleveland v. Citizens Gas Light Co.,* 20 N. J. Eq. 201, as follows:

"The discomforts must be physical, not such as depend upon taste or imagination. But whatever is offensive physically to the senses, and by such offensiveness makes life uncomfortable, is a nuisance; and it is not the less so, because there may be persons whose habits and occupations have brought them to endure the same annoyances without discomfort. Other persons or classes of persons whose senses have not been so hardened, and who, by their education and habits of life, harden [retain] the sensitiveness of their natural organization, are entitled to enjoy life in comfort as they are constituted."

In *Goodrich v. Starrett,* 108 Wash. 437, 184 Pac. 220, wherein the maintenance of an undertaking establishment in a residential section of a city was enjoined, this court made the following statement:

"Indeed, it would seem that it is within the ordinary knowledge of mankind that the erection of an undertaking establishment and morgue in a district of a city suitable only for and used only for residence purposes would decrease the value of the surrounding property. Certainly no one possessing the sensibilities of the ordinary being would take up a residence in its vicinity as long as other places were obtainable."

In *Turtle v. Fitchett,* 156 Wash. 328, 287 Pac. 7, the maintenance of a public bathing resort and picnic grounds on the shore of a small lake situated in a thickly settled community devoted to residential purposes was enjoined as a nuisance essentially interfering with the comfortable enjoyment of life and property. In that case, many prior decisions of this court were reviewed in support of the conclusion reached. In the course of its discussion, the court said:

"Many necessary businesses, such as hospitals, sanitariums and undertaking establishments, as well as other lawful businesses such as bowling alleys, dance halls, moving-picture theaters and amusement resorts, are not nuisances *per se,* but may become so when the conduct thereof is contemplated within an exclusively residential district."

In *Haan v. Heath*, 161 Wash. 128, 296 Pac. 816, a verdict and judgment of damages for depreciation of property caused by the erection of an undertaking establishment in a residence section of a city was upheld by this court. Again, the court pointed out the relative rights and obligations of property owners with respect to the uses of their property, saying:

"We are mindful of the right to engage in a lawful business, and that the undertaking business is a lawful and necessary one; however, we should not lose sight of the right of the citizen to be protected in his home—his right to the enjoyment there of that repose and comfort that are inherently his. The location and maintenance of the appellants' undertaking establishment adjoining respondents' home in a strictly residential district, together with other facts stated above, have deprived the home of the respondents of the comfort and repose to which they are entitled. Also, the respondents have been subjected to financial loss thereby, the depreciation in value of their property."

So, in this case, it can be truly said that, while a sanitarium for mental cases may be a lawful and necessary undertaking, its establishment in a community which has been settled and long used as a residential district, and which is peculiarly adaptable for improvement with substantial homes and the rearing of children, would at once and continuously depreciate the values of such properties to a material extent; and, further, that the maintenance of such an institution in the midst of such a district, under a plan not only to house a great number of mental patients upon the particular premises but also to permit such patients to come and go as they pleased, would cause an immediate and profound alarm in the minds of the people in the neighborhood, would raise a fear for the safety of women and children, and would deprive the property owners of that repose and comfortable enjoyment of their homes to which they are entitled.

In support of his contention to the contrary, appellant cites, in addition to certain cases from other jurisdictions, the following cases from this court: *Rea v. Tacoma Mausoleum Ass'n*, 103 Wash. 429, 174 Pac. 961, 1 A. L. R. 541;

*Hughson v. Wingham,* 120 Wash. 327, 207 Pac. 2, 27 A. L. R. 327; *Liberty Lbr. Co. v. Tacoma,* 142 Wash. 377, 253 Pac. 122; *Zey v. Long Beach,* 144 Wash. 582, 258 Pac. 492, 55 A. L. R. 470; *State ex rel. Hardy v. Superior Court,* 155 Wash. 244, 284 Pac. 93; *State ex rel. Modern Lbr. & Millwork Co. v. MacDuff,* 161 Wash. 600, 297 Pac. 733; *State ex rel. Warner v. Hayes Inv. Corp.,* 13 Wn. (2d) 306, 125 P. (2d) 262.

We will not consume the time and space necessary to set forth the particular facts involved in these respective cases. Nor will we recite the reasons therein advanced for refusing to enjoin the uses of which complaints were made. A reading of those cases will disclose that the relief sought was refused for various reasons: in some, because it appeared that the use to which objection was made was the conduct of a business that had long been established in the particular community; in others, because it was a mere extension of such business; and in still others because the evidence failed to show that the establishment under consideration unreasonably interfered with the health, safety, morals, or general welfare of the people in the particular community. In the case at bar, there was a plethora of evidence to the effect that the establishment of a sanitarium for mental cases in a residential community, such as we have here, extensively populated with women and children, would not only seriously affect the values of all the properties therein, but also would reasonably create a general alarm and apprehension for the safety of the residents and practically destroy the peace of mind, repose, and comfortable enjoyment of their homes, to which they had been accustomed for many years.

One other question remains for decision. At the conclusion of the trial, counsel for respondents and for the interveners filed cost bills which included, among other things, clerk's fees for filing each of the complaints in intervention and statutory attorney's fees for each of the interveners, and also witness fees for such of the interveners as had testified at the trial. Appellant moved to have the costs retaxed by striking all of those items. The motion was denied by the trial court.

The interveners had a vital interest in the matter in litigation and hence were entitled to intervene in the action. Rem. Rev. Stat., § 202 [P. P. C. § 61-1]. They were therefore entitled to their costs for filing their complaints in intervention and were properly allowed their statutory attorney's fees.

However, since they were proper parties and, as litigants in the action, testified in the case, they were not entitled to fees as witnesses. That item should be stricken from the cost bills.

With this modification, the decree will be affirmed and the respondents allowed their costs on appeal.

DRIVER, C. J., BEALS, SIMPSON, and MALLERY, JJ., concur.

¹Reported in 167 P. (2d) 471.