[No. 30547. Department Two. December 16, 1948.]

KING COUNTY et al., Appellants, v. WALTER LUNN et al.,
Respondents.[1]

*Lloyd Shorett, L. C. Brodbeck,* and *Chavelle & Chavelle,*
for appellants.

*Little; Burgunder & Smith,* for respondents.

BEALS, J.—The defendants, Walter and Grace M. Lunn,
husband and wife, are the owners of a tract of land in King
county, approximately three hundred feet by one thousand
feet in size, a few miles south of the city of Seattle, known
as No. 25655 Marine View Drive.

This action was instituted by King county, a municipal
corporation, and a group of individuals owning real estate
located in the vicinity of the tract owned by the defendants,
as plaintiffs.

In their complaint, plaintiffs alleged that the property be-
longing to the defendants and other tracts owned by the
individual plaintiffs, are located in a district which has been

[1] Reported in 200 P. (2d) 981.

zoned, by the appropriate King county authorities, as an R-1 district, pursuant to the provisions of Laws of 1935, chapter 44, p. 115, Rem. Rev. Stat. (Sup.), § 9322-1 [P.P.C. § 776-1] *et seq.* Plaintiffs further alleged that the defendants, for some time prior to the filing of the complaint, had been, and were at that time, operating a restaurant in the dwelling located upon their property above referred to, contrary to the restrictions applicable to the property, which had been zoned R-1, a first-class residential district, the property having been so classified by general resolution No. 6494, as amended by resolution No. 8206, of the board of commissioners of King county.

The plaintiffs, in their complaint, sought relief by way of an injunction requiring the defendants to cease operating a restaurant in the dwelling referred to above.

The superior court denied plaintiffs the relief they sought and entered judgment dismissing the action, with prejudice, from which judgment the plaintiffs have appealed.

Appellants assign error upon the entry of the judgment dismissing the action, contending that the decision is against the weight of the evidence and that the judgment is contrary to law.

The respondents have filed no brief on this appeal.

This court, in the case of *Park v. Stolzheise,* 24 Wn. (2d) 781, 167 P. (2d) 412, considered a question of a similar nature, presented by property owners in the same zoning district as that in which respondents' property is located. In the case cited, King county resolution No. 6494 was discussed at length and certain provisions thereof considered and interpreted. For the sake of brevity, we refer to and adopt, in this opinion, pertinent matter contained in pp. 784-788, both inclusive, of the opinion in *Park v. Stolzheise, supra.*

In that case, the use sought to be enjoined was the establishment of a sanitarium for mental cases. The question there presented was, of course, different from that which we are now called upon to determine.

The respondents purchased the property above described during the month of January, 1946, the property having

been zoned as R-1 (a first-class residential district) more than four years previously, by resolution No. 8206, adopted by the county commissioners of King county, which amended, by zoning a tract of land including respondents' property, the previous zoning resolution No. 6494, referred to above.

Prior to the purchase of the real estate by respondents, the property had been used exclusively for residential purposes. It is bounded on the west by Puget Sound and on the east by Marine View Drive, a paved highway running south from Seattle along a high ridge overlooking Puget Sound, and which, eventually, will be continued as far south as Tacoma.

At the time respondents purchased the property, it was improved with a dwelling and adjacent cottages, and, it having been rumored that respondents would conduct a restaurant in the house, the King county planning commission, June 12, 1946, advised respondents by letter that any use of their property as a restaurant would be a violation of the zoning restrictions and would be contested by the zoning authorities. On the trial, respondents admitted receipt of this letter. A month after the writing of the letter, the executive officer of the zoning commission and another member of that body called at respondents' home and personally warned respondents that any use of the premises by them, in violation of the zoning regulations, would be opposed. During the following fall, they were again advised to the same effect by letter and by two members of the planning commission, who called upon respondents.

November 12, 1946, respondents requested a "home occupation permit," authorizing them to "serve meals in our home," contending that such an operation would not violate any provision of the zoning ordinance. The permit requested by respondents was refused, but, nevertheless, respondents proceeded with their project.

December 13, 1946, the following item appeared in a local weekly newspaper published at Midway, on the Seattle-Tacoma highway:

"FAMED CATERER OPENS RESTAURANT

"November 30 was the opening date for the latest (and destined to be one of the finest) restaurants in this area.

"We refer to ABBIE's, 25655 Marine View Drive. This spot, a log lodge overlooking the Sound, is under the personal direction of Abbie, renowned caterer to Chicago's Gold Coast families for many years. Our 'spies from Chi' inform us that her cooking is superb and predictions have been made for a big future for this, her first enterprise on a commercial scale.

"Mrs. Abbie Lunn is stressing the personal point of view in preparation of her meals served to your individual taste. She wishes to point out that there will be no liquor, dancing, music or games of chance—just well-prepared food, served in an elite, yet homelike atmosphere."

From the evidence, it appears that, for some time thereafter, respondents conducted a restaurant in their home, serving all comers, but that, shortly prior to the trial, they decided to serve only those who had previously ordered meals.

Respondents repeatedly advertised "Private Dinner Parties Served Anytime," in a pamphlet entitled "A Guide to Good Living in Seattle." A typical advertisement, which is found in the number of the magazine dated May 2, 1947, contains a cut of what respondents call their "lodge," together with the legend "ABBIES—Where Food and Atmosphere Blend to Perfection." The number dated December 20, 1946, contains a paragraph referring to "Abbie's, out DesMoines way," and also an advertisement of "ABBIE's Personalized Dinners."

Respondents continued to advertise in the Midway Mercury, in the section of its classified list entitled "Restaurants." The following appeared in the issue dated October 10, 1947:

"ABBIE's AT ZENITH. Catering to private parties, Monday through Friday. Open to the public, Saturday and Sunday serving luncheons, dinners and buffet suppers. For reservations call DesMoines 5513 or MAin 5361, Seattle."

In the issue dated November 14, 1947, respondents also advertised:

"ABBIE's AT ZENITH. Catering to private parties, exclusively. Bridge and shower luncheons, buffet suppers and

dinners. Birthday, wedding and anniversary parties. Home made cakes furnished for special parties, no extra charge. Call Des Moines 5513 for your party arrangements."

Mrs. Lunn testified that such was the basis upon which they were doing business at the time of the trial.

Respondent Walter Lunn, called as a witness by appellants, testified that respondents purchased the property for the purpose of conducting a restaurant in the dwelling located thereon. Respondents and Abbie Lunn, Mr. Lunn's sister, also testified that they were able to serve meals to groups of seventy-five people, and had served parties numbering from forty to sixty-five. They testified that their present intention was not to serve the public generally, but to serve only groups who had ordered in advance.

It appears from the evidence, and the trial court stated in its memorandum opinion, that respondents conducted an orderly business. They sold no liquor, their customers were not noisy, and the customers' automobiles caused no congestion of traffic, as there was a parking area on the property.

The restaurant was operated by respondents, assisted by two members of their family (including "Abbie" Lunn, a professional cook), who resided on the premises. Improvements consisted of the dwelling occupied by respondents, a five-room cottage nearby, and a smaller cottage nearer the beach.

Respondents vigorously contended that they were conducting a "home occupation," and that they were not violating any provision of the zoning ordinance.

Section 2, of basic King county resolution No. 6494, contains many definitions, among them the following:

"HOME OCCUPATION. Any vocation, avocation, trade or profession carried on within a dwelling or an accessory building of a main building by the inhabitants, but not including commercial raising of animals and fowls."

Section 6, of the same resolution, entitled "R-1 RESIDENCE DISTRICT REGULATIONS," contains the following:

"(A) Uses Permitted: . . .

"7. Home occupations, (excluding the commercial raising of animals and fowls) offices and studios for any vocation, avocation, trade or profession carried on within a dwelling or in an accessory building by the inhabitant of the main building where only electric power not exceeding one horse power in one unit is used, where no merchandise, equipment, or other articles are displayed or advertised, and where not more than two assistants are employed. Only one (1) sign, not greater than seventy-two (72) square inches in area bearing only the name and occupation shall be allowed where the office of physician, doctor, dentist or other professional health practitioner is located in his or her dwelling or accessory building. The renting of rooms for lodging purposes only for the accommodation of not to exceed four (4) persons in a one-family dwelling, provided no sign for this use is displayed."

The trial court was of the opinion that the evidence did not support a finding that respondents were violating the provisions of the zoning ordinance, and dismissed the action.

■ During recent years, so-called zoning laws or ordinances have been very generally adopted and have been held to be a lawful exercise of the police power of the state or a political subdivision thereof. *Euclid v. Ambler Realty Co.*, 272 U. S. 365, 71 L. Ed. 303, 47 S. Ct. 114, 54 A. L. R. 1016; *Miller v. Board of Public Works*, 195 Cal. 477, 234 Pac. 381, 38 A. L. R. 1479.

As stated above, we upheld this identical zoning ordinance, and held a proposed use of property to be a violation thereof, in the case of *Park v. Stolzheise, supra.*

In the case of *State ex rel. Kaegel v. Holekamp*, 151 S. W. (2d) (Mo. App.) 685, the denial of an application of a property owner for permission to give private instruction in aesthetic dancing in his residence was upheld, as a violation of a zoning ordinance. The opinion contains the following statement:

"The important thing is, however, that under both the terms of the ordinance and the common sense of the matter, an occupation which will be permitted in a home in a district set apart for residential purposes must be one 'customarily incident to' the use of the premises as a dwelling

place, and not one in which the use of the premises as a dwelling place is largely incidental to the occupation carried on."

In the case of *Devaney v. Board of Zoning Appeals,* 132 Conn. 537, 45 A. (2d) 828, the supreme court of errors of Connecticut affirmed an order of the trial court reversing a ruling of the board of zoning appeals which allowed the use of a dwelling, situated in a zone in which restaurants were barred, for restaurant purposes, saying that, in granting such permission, the board "acted without authority and in clear abuse of the powers vested in it."

██ A careful examination of the record convinces us that the trial court erred in dismissing the action. The fact that the respondents are, as they testified, serving only individuals or groups who make reservations in advance, does not alter the basic fact that they are operating a restaurant in the premises, which they also occupy as a home. The conduct of such a business violates the terms of the applicable zoning ordinance. The evidence discloses, beyond question, that respondents' business is not a "home occupation," which may be carried on pursuant to the provisions of the ordinance.

The judgment appealed from is reversed, with instructions to the trial court to enter a judgment in appellants' favor, permanently enjoining respondents from continuing the operation of a restaurant or the serving of meals for compensation in the premises above described.

MALLERY, C. J., STEINERT, and JEFFERS, JJ., concur.

ROBINSON, J. (dissenting)—After the hearing of this cause, it was assigned to me to prepare an opinion reversing the decision of the trial court. After an intensive study of the record, including the comprehensive and persuasive oral opinion pronounced by the trial judge at the close of the trial, I found myself unable to write an opinion to reverse, and accordingly prepared an opinion affirming the judgment appealed from. This opinion did not meet the approval of my associates, and the preparation of the opin-

ion of the court was reassigned to another member thereof, which reassignment resulted in the foregoing opinion. I cannot concur therewith.

The gist of the majority opinion is found in the following two arbitrary conclusions:

"The conduct of such a business violates the terms of the applicable zoning ordinance. The evidence discloses, beyond question, that respondents' business is not a 'home occupation,' which may be carried on pursuant to the provisions of the ordinance."

Having carefully read all of the evidence after the hearing before the court, upon reading the first of the above determinative sentences, I was at once compelled to query: What terms of the ordinance are violated? For, having read the entire record before preparing the opinion which was rejected by my fellow judges, I was unable to recall any evidence supporting that sentence, and, after a second careful examination of the ordinance and the oral evidence adduced at the trial, I am now unable to find any evidence which discloses a violation of any terms of the ordinance.

Unlike the usual zoning ordinance, the ordinance here involved contains but few specific prohibitions. The ordinary zoning ordinance achieves the purpose intended by reciting a long list of prohibited uses. Resolution No. 6494, as amended, contains scarcely any other prohibition than an incidental prohibition of "The commercial raising of animals and fowls." Clearly, those terms are not violated by the operation of a restaurant. Instead of specifically forbidding certain uses in a residential district, the framers of resolution No. 6494 merely listed such uses as would be permitted in such a district. At this point, I find it necessary to requote, in part, portions of the ordinance which are quoted in the majority opinion:

"SECTION 6. R-1 RESIDENCE DISTRICT REGULATIONS.
"(A) USES PERMITTED:
"1. One- and two-family dwellings.
"2. Art galleries, libraries, museums. . . .
"5. Churches, schools, colleges, non-commercial playgrounds, . . .
"6. Golf courses."

There are seventeen subparagraphs listing "Uses Permitted." We are here primarily concerned with the following paragraph, since the decision of this case turns upon the interpretation and application of its provisions:

"7. Home occupations, (excluding the commercial raising of animals and fowls) offices and studies for any vocation, avocation, trade or profession carried on within a dwelling or in an accessory building by the inhabitant of the main building where only electric power not exceeding one horse power in one unit is used, where no merchandise, equipment, or other articles are displayed or advertised, and where not more than two assistants are employed. Only one (1) sign, not greater than seventy-two (72) square inches in area bearing only the name and occupation shall be allowed where the office of physician, doctor, dentist or other professional health practitioner is located in his or her dwelling or accessory building. The renting of rooms for lodging purposes only for the accommodation of not to exceed four (4) persons in a one-family dwelling, provided no sign for this use is displayed."

As has been hitherto stated, the commercial raising of animals and fowls is about the only use which the ordinance prohibits in "terms." Again, the pertinent query is: What terms of the applicable zoning ordinance are violated by operating a restaurant? I cannot find any such terms; for, certainly, the operation of the restaurant by the respondents does not violate the prohibition of the commercial raising of animals and fowls. There are no terms prohibiting the operation of a restaurant. If the operation of a restaurant be prohibited, it is by inference only, from the fact that it was not specifically listed as a permitted use.

The appellants, in their brief, relied largely upon the case of *Devaney v. Board of Zoning Appeals*, 132 Conn. 537, 45 A. (2d) 828, a case where a restaurant use was enjoined. That case is also cited by the majority, but it is not apposite, as the following lines from the opinion in the case show:

"When he bought the property he voluntarily took a chance that he would be permitted to use it for a purpose *expressly prohibited by ordinance*." (Italics mine.)

In the instant case, a restaurant use is not "expressly prohibited," and no violation of the "terms" of the ordinance is shown.

There is no evidence to the effect that the respondents are employing more than two assistants or using electric power exceeding one horse power in one unit, or that they are displaying or advertising merchandise, equipment, or other articles. These terms of the ordinance were in no way violated.

In delivering his oral opinion at the close of the evidence, the trial judge read subparagraph 7 of § 6 of the ordinance, above quoted, and went on to say:

"Now, I'm forced to the conclusion that the words 'home occupation' as used there with the expression in brackets 'excluding the commercial raising of animals and fowls' refers to something different than doctor's offices and dentists and other health practitioners. It's a general term. I think you could read that, leave out those words about offices and studios, and it makes sense. 'Home occupations . . . for any vocation, avocation, trade or profession carried on within a dwelling or in an accessory building by the inhabitant of the main building where only electric power not exceeding one horse power in one unit is used, where no merchandise, equipment, or other articles are displayed or advertised, and where not more than two assistants are employed.' In other words, you're allowed to have a home occupation that doesn't violate those restrictions.

"Does the running of the kind of an eating place that the defendants are conducting come within those restrictions? Had they stopped with the words 'Home occupations,' I would answer no and would be inclined to agree with Mr. Grinstead's point that the tail is wagging the dog. And to say that home occupations means something incidentally done where the main business of the property or the main use of the property is as a dwelling, but the drafters of this ordinance attempted to do something more than that. They attempted to prescribe limitations and say 'Home occupations . . . for any vocation, avocation, trade or profession carried on within a dwelling or in an accessory building by the inhabitant of the main building where only electric power not exceeding one horse power in one unit is used, where no merchandise, equipment, or other articles are displayed or advertised, and where not more than two

assistants are employed.' It seems to me that the ordinance, itself, gives the test of when the occupation violates the ordinance. If these people were to put out a case of cigarettes and candy bars and chewing gum and pop, or if they didn't live in the building, or if they had more than two assistants, they would be violating the ordinance.

"But in view of the rather loose language of this definition and the fact that restrictions such as these should be liberally interpreted in favor of the property owner, I'm compelled to hold that the operation of this business as the defendants are now operating it and say they intend to operate it is not a violation of the ordinance, that 'Abbie's' is a home occupation as contemplated by the ordinance."

Strangely enough, the person most interested in the result of this case is not a party to the action. I refer to Abbie Lunn, who is called, in the majority opinion, "a professional cook." Her life savings are invested in the restaurant venture, and she is a part owner of the eight-acre tract upon which the restaurant is operated. I quote from her testimony:

"Q. Will you state your name, please? A. Abbie Lunn. Q. And do you live out at this place that's just mentioned? A. I do. Q. In the testimony here. And how old a woman are you? A. Fifty. Q. And what's your normal occupation? A. Cooking. Q. How long have you been following that occupation? A. I practiced cooking for 30 years. Q. I see, and when did you come to Seattle? A. It's just a year ago. Q. Have you any other occupation apart from cooking that you follow? A. No, I do not. Q. Have no other training but that, is that right? A. That's right. Q. And, as a matter of fact, relative to this property that's involved out here, are you a partner of that property? A. I am. Q. And who are the various parties who are interested financially in that property in the family? A. My brother, Walter and my sister, Myrtle. THE COURT: And your sister, who? THE WITNESS: My sister, Myrtle. Q. And yourself, is that right? A. And myself, yes."

On cross-examination, she testified, in part, as follows:

"Q. What was your proportion of expenditure, Miss Lunn, in buying this extra equipment to establish this restaurant; what was your contribution? A. Well, my brother and sister took care of that. Q. Well, you know how much you expended, didn't you, of your own money? A. Oh, yes, I

mean I did put some money into it, surely. Q. Well, was that in the purchase of the property? A. The purchase of the property. Q. Was it in rehabilitation of this place in converting it into a restaurant, or was it both? A. Well, I imagine it would be for whatever use they—they had to have it for. Q. Well, how much did you personally expend in your contribution towards this, establishing this restaurant? MR. HORSWILL: You mean — Q. And buying the property? MR. HORSWILL: The whole property? A. You mean how much in—in money? Q. Yes. A. My life's savings. Q. Give us the amount. A. Two thousand. Q. Two thousand dollars. Now, what proportion of that went into the purchase of the property, and what proportion went into the rehabilitation of the property? A. I couldn't tell you that; I don't know. Q. You entrusted that to Mr. Lunn? A. I sure did. MR. BRODBECK: I think that's all.

"REDIRECT EXAMINATION

"BY MR. HORSWILL: Q. To get that point straight, Miss Lunn, as I understand the effect of your testimony about what happened is this, that the family had a conversation and decided to buy this piece of property; is that right? A. That's right. Q. And then at that time you also had the purpose in mind of serving meals, is that right? A. Well, yes. They had — they — they felt that it was a—nice for the family to be together, and they wanted some means for which I might make my living out here and be with them. They have their own income, and all they're interested in I being able to make my income off of this. Q. All right. So then did you go into any financial details on what was going to have to be bought apart from the real property, or did you just turn a lump sum over to your brother to let him handle the details on it? A. I did, yes. Q. And he, in other words, handled what that money was spent for whether it went into a refrigerator or whether it went into the purchase of the property, itself? A. That's right. MR. HORSWILL: That's all. THE COURT: From the year's operation did you determine whether it was possible to operate there as you were doing at a profit or whether you could make a living at it? THE WITNESS: Well, no, I haven't so far been able to make what I call a fair living out of it. THE COURT: That's all."

After a second study of the complete record, I am still inclined to the view taken by the trial court, and the more so because the majority opinion in no way refutes it or cites

any evidence to support the arbitrary conclusions upon which the overruling of the trial court is based, to wit:

"The conduct of such a business violates the terms of the applicable zoning ordinance. The evidence discloses, beyond question, that respondents' business is not a 'home occupation,' which may be carried on pursuant to the provisions of the ordinance."

Again, I query, with respect to the second conclusion: What evidence?

The record does not support either of the above conclusions.

For the foregoing reasons, I dissent from the majority opinion. In my opinion, the disposition of the case as made by the trial court should be affirmed.

---

January 26, 1949. Petition for rehearing denied.