## Richmond

## JAMES O. COLE AND MARY J. COLE V. CITY COUNCIL OF THE CITY OF WAYNESBORO AND WAYNESBORO REDEVELOPMENT AND HOUSING AUTHORITY

March 3, 1978.

Record No. 761457.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Harman and Compton, JJ.

W. *Clyde Gouldman*, *II (Paxson*, *Smith*, *Boyd*, *Gilliam* & *Gouldman*, on briefs), for plaintiffs in error.

*Carter R. Allen*, *City Attorney*; *Edward M. Burns*, *II (Allen*, *Dalton* & *Watkins*; *Poindexter*, *Burns and Marks*, on briefs), for defendants in error.

HARRISON, J., delivered the opinion of the Court.

The City Council of Waynesboro adopted an ordinance granting an application by the Waynesboro Redevelopment and Housing Authority for a permit to construct a 10-story apartment building for the elderly and the handicapped. The building was to be constructed on a 3/4 acre parcel of land acquired by the City and located at the intersection of Wayne Avenue and 11th Street immediately adjacent to the single-family home owned and occupied by James O. Cole and Mary J. Cole. The Coles filed a motion for a declaratory judgment by the lower court that the Council's action in granting the application as a "special exception" to the zoning ordinance of the City was "void and of no effect" because it was "illegal, arbitrary, capricious, without reasonable relation to public health, safety, morals, and general welfare", and because Section 27-86 of the City Code of Waynesboro, under which the City Council acted, was invalid and unconstitutional. From an adverse decision appellants noted this appeal.

The residence of the Coles is located on lots 7, 8 and 9 in Block 21 of the Waynesboro Company Addition and fronts on Wayne

Avenue. Block 21 is divided into 40 lots; 23 are zoned C-2 (general business district), and 17, including the three owned by appellants, are zoned RB-1 (which permits single-family, as well as two-, three- or four-family dwellings, boarding houses or rooming houses). In anticipation of the construction of the apartment the City acquired nine lots in Block 21. Some of the lots acquired are zoned RB-1 and others C-2. Funds for the acquisition were made available under the Housing and Community Development Act of 1974, and the funding was approved by the U.S. Department of Housing and Urban Development. The City Council had designated the Housing Authority as its local public agent to administer the land for the construction thereon of housing for the elderly and handicapped pursuant to such Act.

We summarize the testimony introduced by appellants and by their experts, in opposition to the action of the City Council, and to the construction of the project.

Appellants claim their residence will be "dwarfed" by the proposed construction;

The apartment project will consist of 151 units located on 3/4 acre of land. Its effective density will therefore be 208 dwelling units per acre. The maximum density presently permitted in any zone in Waynesboro is 20 dwelling units per acre. The City's Comprehensive Plan recommends 5-12 units per acre average density. The density allowed per acre by the Council's special exception is alleged to be in excess of that permitted by any other city in Virginia;

The proposed building will be designed to have a height of 92 feet. The maximum height permitted under the City's zoning restrictions is 35 feet in RB-1 districts and 50 feet in C-2 districts;

The apartment project provides for only 32 off-street parking spaces while under the City Code an apartment of this size must provide for a minimum of 151 off-street parking spaces;

The apartment building will violate numerous setback provisions of the City Code. The special exception ordinance provides for no setback on 11th Street, a 9' 8" rear yard setback, and the building will be located only 15 feet from the Cole property.

The effect of the special exception is to change the use of a portion of Block 21 from no residential use, and the balance from low density residential use, to high density residential use, a use the Coles say was never before permitted or envisioned in these districts.

The Coles attribute the City's selection of the site adjoining their property, and its rejection of alternative sites, to its fear of losing federal funds, and to the enthusiasm and interest of certain promoters of the project. They say that the proposed project will have a severe adverse impact on the entire neighborhood for the reason that it will introduce a very intense land use into what is now a primarily single-family area. They contend such a use had not been anticipated by the residents of the area or planned for by the City.

The Coles further argue that despite the City's claims to the contrary, it did not impose any regulations and safeguards when it granted the special exception permit. They say that the Housing Authority asked Council for the right to build a structure not to exceed 92 feet in height with certain other maximum and minimum specifications; that this request was granted without change; and that the ordinance was "tailored" by Council to exactly what was needed in order to fit the proposed building into the site which the Housing Authority and its advisors had determined was the proper one for the building. Appellants contend that in doing this the Council violated virtually every zoning restriction that had previously been applicable to their property, to other property in the block and to other property in the City of Waynesboro. In brief, appellants say that the City acted wholly without regard to "good zoning practices", and that an invalid city ordinance permitted City Council to do so.

The position of the City of Waynesboro and the Housing Authority is that there is a great need for housing for the elderly and the handicapped, and that public necessity and convenience and the general welfare of the public require that this need be met.

The application of the Housing Authority to the City Council for a special exception was referred to the Waynesboro City Planning and Zoning Commission. A public hearing was had, but the Commission deadlocked on a motion to grant the special exception and therefore was unable to make any

recommendation. After appropriate advertisement and notice, Council held a public hearing and voted, with one dissent, to adopt an ordinance granting the special exception.

Upon a trial in the court below, witnesses, including planning and land use experts, were introduced by the City. The City Manager reviewed other sites that had been considered by Council for the location of the apartment project, giving the objections to each, or the impediments encountered. He noted the residential character of the real estate located to the south of the proposed site and the commercial character of the real estate to the north.

The testimony of various witnesses shows that the project site forms the fourth corner of a traffic-regulated intersection at which are located the First Baptist Church, the First Presbyterian Church and the multi-storied City Hall. Witnesses for the City stressed the fact that an apartment to house the elderly and the handicapped would have to be designed and constructed in a manner different from the usual apartment building. They pointed out that the site was within three blocks of churches, banks, retail stores, the City's public library, the YMCA and other recreational facilities, and the City's downtown business area, as well as some of its residential areas.

There was also testimony by the City that a project of the kind envisioned had to be "affordable" and that the funds loaned for the construction of the building had to be repaid from rents received. Appellees argued that this required a multi-storied building and careful control of expenditures for site acquisition as well as site preparation. It was testified that of all the sites under consideration the site in question appeared to have the greatest number of facilities available within the shortest walking distance for the aged and the handicapped who would occupy the building.

The City points out that housing for the elderly and the handicapped requires far fewer off-street parking spaces than the ordinary housing project because its occupants own and operate fewer vehicles. Responding to the Coles' argument that the City was violating at least five major types of zoning restrictions, Council responded that it had "weighed its current zoning restriction setback requirements, etc. against the need for housing for the elderly and the handicapped, and the opportunity to provide such conveniently situated and

economically feasible and thereupon adopted the special use exception ordinance".

■ In view of our decision, a more detailed discussion of the evidence is not indicated. The trial judge found that the evidence was in conflict and that it was not shown that the City Council of Waynesboro, in issuing the special exception, acted in an unreasonable, arbitrary or capricious manner, or abused its power. It is unnecessary for us to consider the correctness of this finding. The problem here, and the fatal flaw in the City's defense, is the ordinance under which it acted.

At the time Waynesboro's zoning ordinances were adopted, and as permitted by Virginia Code § 15.1-491,[1] the City enacted City Code § 27-86, which ordinance provides, in pertinent part, as follows:

"The city council reserves unto itself the right to issue a special exception or use permit whenever public necessity and convenience, general welfare or good zoning practice justifies such special exception or use permits which may be granted by the council adopting an ordinance granting the same after considering the recommendations of the city planning and zoning commission. . . ."

In the instant case, on August 11, 1975, the City Council granted to the Housing Authority a "Special Exception as a Special Use Permit under the Zoning Ordinance". The preamble of the ordinance it enacted reads as follows:

"WHEREAS, after public hearings held pursuant to due notice under the provisions of Section 15.1-431 of the Virginia Code, 1973 Replacement Volume, the Council of the City of Waynesboro, Virginia, finds that it would be in the public interest and the convenience and welfare of its citizens, consonant with the efficient and economical use of public funds, subject to certain exceptions and suitable regulations and safeguards, to grant a Special Use Permit as a Special

---

[1] Virginia Code § 15.1-491 provides that "[a] zoning ordinance may include, among other things, reasonable regulations and provisions . . . [f]or the granting of special exceptions under suitable regulations and safeguards; and notwithstanding any other provisions of this article, the governing body of any city, county or town may reserve unto itself the right to issue such special exception or use permit". (Va. Code § 15.1-491(c).)

Exception to the Zoning Ordinance of this City for the location of a mid-rise housing project for elderly and handicapped residents in this City at the southeast intersection of Wayne Avenue and 11th Street; and, therefore, . . ."

The Waynesboro ordinance (§ 27-86) under which the City Council acted in granting the Housing Authority a special exception and a special use permit is fatally defective and invalid. It reserves to the Council the authority to issue a special exception or use permit for the construction of a building in any zoning district in Waynesboro whenever, in its sole discretion, such action is justified by public necessity and convenience and the general welfare. The ordinance gives Council an opportunity to grant a special exception without a consideration of good zoning practices or a consideration by it of the purposes of the zoning ordinances of the city or the objectives which zoning ordinances seek to accomplish. The presumption of validity which attaches to this ordinance cannot prevail against such a patent defect in the face thereof.[2]

No recommendation for the permit was made by the City Planning and Zoning Commission, and the only exceptions, regulations and safeguards attached to the permit were those that are apparently necessary to fit the proposed building on the 3/4 acre site. The only predicate given by City Council for granting the special permit was that it was "in the public interest and the convenience and welfare of its citizens, consonant with the efficient and economical use of public funds". This was all that was required by the ordinance (§ 27-86). In fact, it was more. Under the ordinance Council had only to find public necessity and convenience and general welfare. The ordinance is an open invitation for a special exception to be granted without any consideration being given to certain basic principles of law applicable in the zoning field. It permits a lack of adherence by City Council to a fundamental rule that zoning regulates the use of land.

The zoning ordinances and comprehensive plan of the city show it to be divided into thirteen zoning districts, in each of which only certain designated uses of land are permitted. This was done so that the City could develop in an orderly manner in

[2] We are not unmindful that the language of the Waynesboro ordinance (§ 27-86) is also found in Virginia Code § 15.1-491.

accordance with a comprehensive plan. If a special exception is to be granted, and a special use of land in a certain district permitted, the legislative body granting the use must consider its relation to the public health, safety, morals and general welfare and whether the granting of the exception will be effective to subserve the public objectives set forth in the City's zoning ordinances.

■ The general principles involved in zoning have been reviewed too often in recent cases to be again stated. The zoning statutes of Virginia, and those enacted by her political subdivisions, are designed to strike a delicate balance between private property rights and public interest. One who owns land always faces a possibility of its being rezoned. However, our policy, which holds that permissible land use should be reasonably predictable, assures a landowner that such use will not be changed suddenly, arbitrarily or capriciously, but only after a period of investigation and community planning, and only where circumstances substantially affecting the public interest have changed. As we said in *Fairfax County* v. *Snell Corp.*, 214 Va. 655, 659, 202 S.E.2d 889, 893 (1974): "Such stability and predictability in the law serve the interest of both the landowner and the public."

While public convenience and necessity, and general welfare, are indeed important factors to be considered by a legislative body in the granting of a special use permit, they are not the sole considerations. No one in the instant case has disputed the need for adequate housing for the elderly and the handicapped. And no one will deny that public convenience and the general welfare of the people will be served by the construction of the apartment project in Waynesboro, whether on the proposed site or elsewhere in the city. However, the issue is one which concerns *land use* as well as the general welfare and public convenience. The granting of a special exception in a zoning district is an action which must be taken within the framework of the zoning statutes and principles that apply to zoning. It cannot be taken if such action is inconsistent with good zoning practices.

In making its decision the trial court relied heavily upon *Byrum* v. *Orange County*, 217 Va. 37, 225 S.E.2d 369 (1976), and *Bollinger* v. *Roanoke County*, 217 Va. 185, 227 S.E.2d 682 (1976). This reliance was misplaced. In *Byrum* the issue was the granting of a use permit for a mobile home park. Byrum's

property was zoned "Agricultural District A" in which thirteen uses were authorized. In addition, the ordinance provided that mobile homes or trailer parks were among the uses that "may be permitted" in Agricultural District A upon the issuance of a conditional use permit by the Board of Supervisors. A high-rise apartment is not listed as a "permitted" use in either Waynesboro's zoning district RB-1 or district C-2. Further, the Orange County zoning ordinance provided detailed guidelines which were to be used by the governing body in imposing conditions in event a permitted use was approved. Byrum claimed that the Board did not have the power to deny him a permit for a use which was expressly permitted, although not authorized, by the zoning ordinance. We found the denial by the Board to be within the framework of the county zoning ordinances and held that the statutes and zoning ordinance involved "contain sufficient guidelines to enable the governing body of Orange County to exercise effectively its legislative function of granting or denying use permits under the ordinance". 217 Va. at 44, 225 S.E.2d at 374.

In *Bollinger* v. *Roanoke County, supra,* the Roanoke County Code specifically provided that the location of certain activities, including sanitary landfills, would require a conditional use permit which the Board of Supervisors reserved unto itself the power to issue. We found that the Board there acted in accordance with its zoning ordinances and "only after it had the benefit of thorough studies, numerous tests, and after due deliberation on its part. These studies and tests revealed that *the land is suitable for landfill purposes.* The terms and conditions imposed by the Board indicate that it was well aware of *the uses of surrounding land* and *the characteristics of the property involved".* [Emphasis added.] 217 Va. at 187, 227 S.E.2d at 684. In *Bollinger,* as in the instant case, there was no argument about the necessity for the facility, or that the interests of the public would not be served. But its location involved not alone necessity and general welfare but the characteristics and suitability of the land itself, the suitability of the location for landfill purposes and an awareness of the uses being put to surrounding property. Some of these are factors necessarily involved in every zoning situation.

Neither *Byrum* nor *Bollinger* plowed new ground. Their precedent was *Maritime Union* v. *City of Norfolk,* 202 Va. 672,

119 S.E.2d 307 (1961). The appellant there contended that an ordinance of the City Council of Norfolk failed to provide adequate standards to guide Council in granting or denying a use permit for a union hiring hall. The disputed section read, in part:

" 'If the City Council shall find that the use for which a Use Permit is sought will not (1) adversely affect the health or safety of persons residing or working in the neighborhood of the proposed use, (2) will not be detrimental to the public welfare or injurious to property or improvements in the neighborhood, and (3) *will be in accord with the purposes of this ordinance and the City Plan of the City of Norfolk*, it shall issue the Use Permit, provided that all other provisions of law and ordinance shall have been complied with. In granting any Use Permit, the Council shall designate such conditions in connection therewith as will, in its opinion, assure that the use will conform to the foregoing requirements and that it will continue to do so.' " [Emphasis added.] 202 Va. at 679, 119 S.E.2d at 312.

We said that the controversial section was an integral part of the whole Norfolk ordinance and could not be read without reference to many of the other sections of the ordinance, and held:

"From the whole ordinance, we find that the City Council of Norfolk has declared a legislative policy to be followed, has established primary standards for carrying out such policy, has prescribed a clear-cut principle to which it must conform with appropriate regard for the public interest, and has set out a clear and definite procedure to be followed in acting on applications for use permits. The ordinance makes it mandatory upon City Council to issue the requested use permit if the standards prescribed have been met. Under those circumstances, there has been provided sufficient protection against an arbitrary and uncontrolled exercise of discretion, and the challenge to the validity of the standards has, therefore, been met." 202 Va. at 682, 119 S.E.2d at 314.

The findings required to be made by Norfolk City Council as a prerequisite to issuing a use permit for a union hiring hall are among the same factors listed in the purpose section (§ 27.1) of the Waynesboro zoning ordinance. They are matters of health

and safety of persons residing or working in the neighborhood of the proposed use, public welfare, injury to property or improvements in the neighborhood of the use, and whether the use would accord with the purposes of the zoning ordinance. We also observe here that a union hiring hall was a use permitted (with a permit by Council) in the zoning district in which the appellants in *Maritime* sought to construct a hall.

█ The standards by which applications for special use permits should be judged have been discussed at length by treatise writers. *See* Rothkopf, 1 *The Law of Zoning and Planning*, § 12.06 (4th ed. 1972); 8 McQuillan, *Municipal Corporations*, "Zoning", § 25.160 (1976); 2 Yokley, *Zoning Law and Practice*, § 15.4 (3rd ed. 1965); 82 Am.Jur.2d *Zoning and Planning* § 281, *et seq.* (1976); 101 C.J.S. *Zoning* § 271, *et seq.* (1958); 21A M.J., *Zoning and Planning*, § 5 (1964).

When the governing body of any locality reserves unto itself the right to issue special exceptions or use permits, as it is permitted by Code § 15.1-491, we have held that the granting of such exceptions and permits is a legislative function. *Byrum, supra; Bollinger, supra;* and *Maritime, supra.* However, in each case we specifically found that the enabling statutes, together with the zoning ordinances under which the counties and the city were acting, set forth the purposes and intents of the zoning ordinances and contained sufficient outlines and standards for enacting and administering them.

The governing body of a county, city or town has the authority to grant to an appropriate agency the power to grant special exceptions and special permits to the extent, and under the circumstances, specified in the ordinance granting the power. The agency, usually the board of zoning appeals, then acts under the standards and guidelines set out in the ordinance, and its action must be reasonable in light of these and all other pertinent facts. A city council, having reserved to itself the right to grant a special exception or special permit, can act only after due consideration of the same factors which the administrative body would have been required to consider had such authority been delegated to it by council. Or, as stated earlier in this opinion, a special exception to a zoning ordinance cannot be granted either by an administrative body operating under standards fixed by the legislative body, or by the legislative body itself, if such action be inconsistent with good zoning practices.

A property owner whose land is involved is entitled to be accorded the same treatment, and to have the same factors considered, whether the decision is made by an administrative body, such as a board of zoning appeals, or by a legislative body, such as a city council or board of supervisors. Action by either must be taken within the framework of the zoning ordinances and state statutes on zoning, because a special exception and a use permit involve land use, and that is what zoning is all about. Therefore, their actions must be measured by zoning considerations, and not merely by whether such actions are reasonable, or are arbitrary and capricious.

■ The fact that in the case under review the City Council was specifically permitted by the ordinance to consider good zoning practices is not the point. An ordinance restricting the use of property should not admit of the exercise, *or the opportunity for the exercise*, of any arbitrary action by the municipal authority between citizens, or of any action by such authority which does not comport with good zoning practices. "The legality of the ordinance is to be tested not by what has been done under it, but by what may, by its authority, be done." *Assaid* v. *Roanoke*, 179 Va. 47, 51, 18 S.E.2d 287, 288 (1942).

Accordingly, and for the reasons assigned in this opinion, the ordinance adopted by the City Council of Waynesboro on August 11, 1975, is declared to be invalid, and the grant of a special exception as a special use permit to the Housing Authority is declared void and of no effect. The final order of the lower court is reversed, and final judgment will be entered here for appellants.

*Reversed and final judgment.*