[No. 61539-0. En Banc. October 19, 1995.]

SUNDERLAND FAMILY TREATMENT SERVICES, *Respondent*, v. THE CITY OF PASCO, *Appellant*.

*Greg A. Rubstello,* for appellant.
*Timothy G. Klashke,* for respondent.

JOHNSON, J. — This case requires us to decide whether the City of Pasco's denial of a special use permit to Sunderland Family Treatment Services for a group home for troubled teens was proper. The superior court reversed the city council's decision, holding it violated the handicap discrimination provisions of the state housing policy act. The City appealed directly to this court. Sunderland filed a cross-appeal, alleging the City's decision was premised on findings of fact that were not supported by substantial evidence. We reverse the trial court on the discrimination issue. However, because we find the City's decision is not supported by substantial evidence, we remand to the City for further proceedings.

## FACTS

On March 29, 1993, Sunderland Family Treatment Services (Sunderland) applied to the City of Pasco (City) for a special use permit to locate a group home crisis residential center (Home) in a Sunderland-owned residence located in an R-1 zoning district.

Under the Pasco Municipal Code (PMC), the Home could have been classified as a "group care facility" (PMC 22.12.385) or a "community service facility" (PMC 22.12.215). Either was an "unclassified use" under PMC 22.80.020 which was permitted in "any district where not otherwise prohibited" but which required a special use

permit no matter where it was proposed to be located. PMC 22.80.010.

The proposed Home was an existing six-bedroom, single-family residence, having 2,652 square feet and situated on a 5,750-square-foot lot. The Home did not require any physical alterations to the exterior and would have been indistinguishable from the single-family residences in the neighborhood.

Sunderland proposed to house up to eight children (ages twelve through seventeen), who were abused or neglected by their parents or who had no other place to go. The children would be placed by social service agencies pursuant to RCW 74.13.032,[1] establishing crisis residential centers. Sunderland specifically assured the neighbors and the City the Home would not accept children using drugs or alcohol. No loud music, physical or verbal aggression, or smoking would be permitted. At least two full-time staff members would supervise the children and take them to school and offsite counseling. During the nighttime hours, staff would remain awake to receive placements from Child Protective Services and local police who needed to place children in custody for their own protection.

Neighbors of the proposed Home circulated a petition opposing the special use permit. Many testified at the April 22, 1993, meeting of the planning commission and at the May 17 meeting of the city council. The neighbors questioned whether the children would be properly supervised and cited the high number of elderly persons living in the neighborhood. The planning commission voted to recommend denial of the permit and entered findings of fact supporting its decision.

On June 7, 1993, the city council voted to deny Sunderland's proposed special use permit. Their decision rested on five findings of fact. First, the location, size, and

---

[1]This section and those following authorize the establishment of crisis residential centers to provide temporary shelter and services to juveniles with the goal of facilitating their reentry to normal family life. *See also* RCW 13.32A, the Family Reconciliation Act.

intensity of the proposed use would not be harmonious with the orderly and existing development of the otherwise purely residential character of the neighborhood. Second, the proposed use would house troubled children adjacent to single-family homes and apartment units lived in by many elderly and young families with small children. Third, the operations would impair the value of adjacent properties by diminishing their desirability as single-family residential units. Fourth, the proposed use would concentrate juveniles at a single residential site with the high probability of bringing more noise, security concerns, and other nuisance activity. Fifth, the proposed use would be better located in a more transitional neighborhood.

Sunderland petitioned the Franklin County Superior Court for a writ of certiorari pursuant to RCW 7.16, which was granted. Sunderland argued the City's decision violated the Washington Housing Policy Act (WHPA)[2] and was premised on factual findings which were not supported by substantial evidence. The Honorable Duane E. Taber reversed the City's denial of the special use permit, finding the City's denial constituted handicap discrimination under the WHPA. He also found the City's findings of fact 3 and 4 were not supported by the evidence, but that the remaining findings were minimally supported. The court ordered Sunderland be immediately entitled to operate the Home without a special use permit.

The City petitioned this court for direct review, and Sunderland cross-appealed. In its reply brief, Cross-Appellant Sunderland disclosed the Home had lost its funding as a crisis residential center.[3] Instead, Sunderland proposes to use crisis response unit funding to operate the Home, which would be "indistinguishable in manner of

[2]Laws of 1993, ch. 478. The specific provisions cited by Sunderland were section 20 and 21, codified at RCW 35.63.220 and RCW 35A.63.240. The effective date of the WHPA was July 25, 1993.

[3]The City filed a motion to strike Sunderland's reply brief. The City's arguments are without merit and we deny.

day-to-day operation from the originally contemplated [crisis residential center]." Reply Br. of Resp't, at 2.

## ANALYSIS

■■ The grant or denial of a special use permit by local government is adjudicatory in nature. *Pentagram Corp. v. City of Seattle*, 28 Wn. App. 219, 227, 622 P.2d 892 (1981). Review is by writ of certiorari under RCW 7.16. *State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce*, 65 Wn. App. 614, 617, 829 P.2d 217, *review denied*, 120 Wn.2d 1008 (1992). Under this chapter, the superior court reviews only the administrative record below and takes no new evidence. *Grader v. Lynnwood*, 45 Wn. App. 876, 879, 728 P.2d 1057 (1986).

■ The standard of review is specified in RCW 7.16.120. Issues of law are reviewed to determine whether the decision below was contrary to law. RCW 7.16.120(3). This is a de novo standard. *County of Pierce*, 65 Wn. App. at 618. We apply this standard to the question of whether the City's denial violated the WHPA.

■■ Issues of fact are reviewed to determine whether they are supported by competent and substantial evidence. RCW 7.16.120(4), (5); *Freeburg v. City of Seattle*, 71 Wn. App. 367, 371, 859 P.2d 610 (1993). This review is deferential and requires the court to view the evidence and reasonable inferences therefrom in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority. *Freeburg*, 71 Wn. App. at 371-72; *County of Pierce*, 65 Wn. App. at 618. We apply this standard to the city council's findings of fact.

### Application of the Housing Policy Act

■ The issue of the application of the WHPA was raised for the first time on appeal to the trial court. Generally, it is not proper to consider issues not raised in the original administrative proceeding. *Stahl v. University of Wash.*, 39 Wn. App. 50, 54, 691 P.2d 972 (1984). However, this

court has allowed new statutory arguments in some cases. *E.g., Osborn v. Public Hosp. Dist. 1*, 80 Wn.2d 201, 206, 492 P.2d 1025 (1972). Because the statute in question here was not yet effective at the time the City acted, yet was arguably retroactive, Sunderland should not be expected to have raised the issue at the permit hearing. Sunderland did raise this issue at the trial court level, however, and it forms the basis for the trial court's decision. For this reason, we will consider the issue.[4]

As a threshold matter, we assume without holding that the WHPA, which became effective on July 25, 1993, applies here because the parties do not dispute it.

We turn then to whether the planned population of the Home is handicapped under the WHPA.[5] The statute does not itself define "handicap." Instead it references the federal Fair Housing Amendments Act of 1988, 42 U.S.C. § 3602:

(h) "Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment . . .

Sunderland argues the children it proposes to serve fit either the first or third category. It states, for the first time on appeal, that the children are severely emotionally disturbed. In deciding whether the children are handi-

---

[4]In contrast to the applicability of the state housing policy act, the applicability of its federal counterpart was first raised on appeal to this court. Sunderland does not claim the federal act has a different scope than the state act. Therefore, it is unnecessary for this court to consider it.

[5]The WHPA, in pertinent part, provides:

"No city may enact or maintain an ordinance, development regulation, zoning regulation or official control, policy, or administrative practice which treats a residential structure occupied by persons with handicaps differently than a similar residential structure occupied by a family or other unrelated individuals. As used in this section, 'handicaps' are as defined in the federal fair housing amendments act of 1988 (42 U.S.C. Sec. 3602)." RCW 35A.63.240.

capped, we look only to the factual record created by Sunderland at the administrative hearing for a description of the children's impairments. Under RCW 7.16, courts review only the administrative record below and *take no new evidence. Grader,* 45 Wn. App. at 879. Even when we agree to entertain a new legal argument on appeal, we cannot change the factual record.

The record before the City at the time of its decision reveals the children to be served are abused, homeless, neglected, or have nowhere else to go. Only in the letter requesting review from the city council does Sunderland assert "these youths for the most part have emotional disabilities," but it provides no elaboration. Return of Writ at 104. Therefore, we do not consider whether emotionally disturbed children are handicapped, but whether abused and neglected children are handicapped.

We also cannot look to the statute under which the Home originally was to be operated—RCW 74.13.032, governing crisis residential centers. Although that statute is referred to in the record and describes the population served, its application has been mooted by the loss of the funding source.

The first category of handicap recognized under the WHPA is a physical or mental impairment that substantially limits some major life activity. Because the definition is drawn from federal law, we may look to federal statutes and regulations for further definition. *Clarke v. Shoreline Sch. Dist. 412,* 106 Wn.2d 102, 118-19, 720 P.2d 793 (1986). The regulation implementing the federal Fair Housing Amendments Act of 1988, 24 C.F.R. § 100.201(a)(2) (1994), provides that physical or mental impairment includes:

> Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term *physical or mental impairment* includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular

dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

The regulations implementing the Rehabilitation Act of 1973[6] are also instructive since the "handicap" definition is identical to that in the housing act. 45 C.F.R. pt. 84, app. A contains language identical to the above, but it goes on to say:

[O]nly physical and mental handicaps are included. Thus, environmental, cultural, and economic disadvantage are not in themselves covered; nor are prison records, age, or homosexuality. Of course, if a person who has any of these characteristics also has a physical or mental handicap, the person is included within the definition of handicapped person.

45 C.F.R. pt. 84, app. A, at 355 (1994).

Applying this definition to the abused and neglected children in this case, we conclude they are not handicapped because abuse and neglect are environmental and cultural factors. These factors may undoubtedly produce physical or mental effects. However, these effects do not in every case limit the victim's participation in major life activities. Such a connection would be necessary in order to find Sunderland's proposed clients handicapped as a matter of law using this first definition.

The second definition Sunderland asks us to apply is more troublesome. Under this definition, a person is handicapped if he or she is regarded by others as having such an impairment. 24 C.F.R. § 100.201(d)(3) clarifies that this definition includes those with none of the impairments listed above, but who are treated by others as having such an impairment. Sunderland argues the mere fact of the neighborhood opposition proves the children were "regarded as having such an impairment."

---

[6]Pub. L. No. 93-112 § 7, 87 Stat. 359 (codified at 29 U.S.C. § 706).

The problem with this argument is its circularity. If discrimination proves a handicap, then all victims of discrimination become handicapped, whether the discrimination is due to race, age, criminal record, or traditional handicaps. The key to understanding this language is the phrase "such an impairment." This is a reference back to physical or mental impairment. Therefore, we look at the record to see whether the neighbors opposed the location of the Home because of perceived physical or mental impairments.

Most of the testimony from the public hearings reflects worry about the behavior of teenagers, particularly those with troubled family backgrounds. The following are typical examples:

> There's just too many of us old people that we have raised our families and they just don't want it. We have a couple of families now in the neighborhood that [have] children and it-sometimes it's pretty uncontrolled. They're bouncing the ball off our car into or out there playing football in the street. . . . That's why we pay for state and rural parks to be taken care of.

Return of Writ at 88.

> Most of the children I think that will be coming here are children that don't want to do what they're told. That's why they're in trouble.

Return of Writ at 156. It is clear these speakers based their opposition on the age and family backgrounds of the Sunderland children, not on any perceived physical or mental impairment. Therefore, the children are not handicapped under this definition either.

Based on the record before the court, we find the children to be served by Sunderland are not handicapped, and the trial court erred in so finding.

### Factual Basis for the City's Denial

Sunderland argues the findings of fact (Return of Writ at 176) are not supported by substantial evidence in the

record before the city council. This record consists of the permit application, the determination of nonsignificance under the State Environmental Policy Act of 1971, correspondence from the applicant and interested citizens concerning the proposed operation, planning commission documents and public hearing transcripts, documents and correspondence regarding the appeal to the city council, and city council documents and public hearing transcripts.

We evaluate each finding against this record.

> Finding of fact 1: The location and size of the proposed use are not harmonious with the orderly and existing development of the residential district where the subject property is located. The intensity of the proposed operations is not harmonious with the otherwise purely residential character of the neighborhood.

Sunderland argues the "location and size" are harmonious because the Home would resemble a single-family home in all physical respects. This argument is consistent with the representations of Sunderland to the City that it would not make any exterior changes. There is no evidence to the contrary.

The City's argument is the Home is commercial, not residential in nature. While true, this argument goes to the "intensity" of the use rather than the "location and size." Furthermore, evidence of "intensity" is sparse. Sunderland testified traffic to and from the Home would be minimal and that friends and families would not be allowed to visit. Counseling would be provided offsite and the home would be used solely as a residence. There was no evidence to the contrary presented by opponents to the project. Although the Home is commercial in nature, there is no evidence to support a greater intensity of use. Therefore, the first finding of fact is not supported by the record.

> Finding of fact 2: The proposed use will house troubled youth on a short-term or temporary basis away from their families.

All of the adjacent neighboring properties are developed for single-family homes or a residential apartment housing family units. There are many elderly and young families with small children in the immediate area.

Sunderland argues the Home's residents will not be "troubled" in the sense the City implies, i.e., delinquents or drug users. However, there is ample evidence the residents will be abused or neglected children. The court need not try to read the City's mind. There is substantial evidence supporting the finding that the proposed residents are troubled.

Likewise, planning commission documents show the area is composed primarily of single-family homes, with one apartment building immediately adjacent on the west. Local residents testified to the presence of elderly and young families. There is substantial evidence to support the second finding of fact.

Finding of fact 3: Although the location and height of the existing structure is consistent with the surrounding neighborhood, the operations involved by the proposed use will impair the value of adjacent properties by diminishing their desirability as single-family residential units due to concerns for the safety of elderly homeowners and young families for their children.

Sunderland and the City agree this finding is based upon fears of neighborhood residents rather than more objective evidence, such as real estate expert opinion. In the past, this court has acknowledged that neighbors' fears may reduce property values. *See Park v. Stolzheise*, 24 Wn.2d 781, 793-94, 167 P.2d 412 (1946) (location of a sanitorium for mental patients). However, there is an important distinction between well founded fears and those based on inaccurate stereotypes and popular prejudices. *See J.W. v. Tacoma*, 720 F.2d 1126, 1132 n.7 (9th Cir. 1983). Courts have long held the latter cannot justify zoning restrictions. *E.g., Buchanan v. Warley*, 245 U.S. 60, 82, 38 S. Ct. 16, 62 L. Ed. 149 (1917) (zoning restrictions based on race).

In this case, there is no evidence the Home would have any effect on the safety of the elderly or children in the area. Any reduction in property values would be based on unsubstantiated fears with regard to teenagers from troubled families. This is not competent nor substantial evidence to support the City's finding.

> Finding of fact 4: The proposed use will concentrate at a single residential site juveniles under the age of eighteen who come from troubled families and backgrounds with the high probability of bringing more objectionable noise, concerns for security, and other nuisance activity to the neighborhood than the existing residential family units provide.

Like finding of fact 3, this finding rests on testimony by neighbors as to their fears about the Home. This testimony was countered by testimony from Sunderland, specifically stating the Home's residents would be supervised at all times by at least two trained adults, that drugs and alcohol would not be tolerated, and friends and relatives would not be allowed to visit. Therefore, this finding also rests on *unsubstantiated* fears rather than substantial evidence.

> Finding of fact 5: The proposed use is better located in a neighborhood more transitional in nature from residential to commerce. This neighborhood is a stable, long-standing residential neighborhood.

The first sentence of this finding is a conclusion rather than a finding of fact. There is no evidence in the record with regard to any alternative sites. Therefore, this sentence is not supported by the evidence.

Although Sunderland argues the second sentence is also unsupported because of commercial uses within a few blocks' radius, the city planning commission adequately documented the residential nature of the immediate area around the proposed Home. Therefore, this part of the finding is supported.

Of the City's five findings, therefore, only the second and a portion of the fifth find support in the record. These remaining findings, in their entirety, provide:

The proposed use will house troubled youth on a short term or temporary basis away from their families. All of the adjacent neighboring properties are developed for single-family homes or a residential apartment housing family units. There are many elderly and young families with small children in the immediate area. This neighborhood is a stable, long-standing residential neighborhood.

In order to determine whether the above findings are sufficient to support denial, it is necessary to look at the nature of the special use permit and what must be proved and by whom in order for the permit to issue.

Under PMC 22.80.010, an unclassified use "may be permitted within any district where not otherwise prohibited." Examples of such uses include high schools, cemeteries, correctional institutions, golf courses, park and ride lots, and convents, as well as group homes. The rationale for requiring a special use permit is that these uses "are deemed to require special review to consider, on a case by case basis, their impacts on which would serve them." PMC 22.80.010.

This rationale is consistent with other jurisdictions' use of special permits to accommodate uses beneficial to the community as a whole but having perhaps undesirable impacts on their immediate neighbors. *See* 3 Robert M. Anderson, *American Law of Zoning* § 21.06, at 643 (3d ed. 1986). These uses, in distinction with variances, are *permitted*, not prohibited, subject to the right of the municipality to impose conditions or to disapprove. Anderson at § 21.02.

The majority of jurisdictions require the municipal legislative authority to adopt specific standards for disapproval or the imposition of conditions. Anderson at § 21.10. Such standards protect the applicant from arbitrary action, prevent discrimination, and facilitate judicial review. *State ex rel. Standard Mining & Dev. Corp. v. Auburn*, 82 Wn.2d 321, 327 n.3, 510 P.2d 647 (1973) (citing *Zylka v. Crystal*, 283 Minn. 192, 197 n.9, 167 N.W.2d 45 (1969)).

Washington, however, has adopted the minority po-

sition and does not require specific standards. We require only general standards, such as those contained in a comprehensive plan. *Standard Mining & Dev.*, 82 Wn.2d at 329-30. Without such standards, reviewing courts are unable to judge whether an applicant has met the reasonable conditions for issuance of a permit. When such standards have not been adopted, it is appropriate for the decision-making body to have the burden to justify its decision. *See Pentagram*, 28 Wn. App. at 228-29. The usual presumption of reasonableness does not attach to the permit decision. *Pentagram*, 28 Wn. App. at 229.

Because the PMC does not set forth any standards against which we can judge the reasonableness of the City's denial, the City has the burden of showing why a generally permitted use is inappropriate in this case.

To determine whether this burden was met, we look to the City's findings of fact. Here the findings were minimal. The proposed use involved teenagers living away from their families while the existing use involved elderly people and young families. Differences in the age of residents does not seem like a reasonable distinction on which to base the permit denial. The children were "troubled." While this word may suggest a public safety factor, it falls far short of constituting an actual threat on which a decision might be validly based.

 In fact, the City's denial appears to rest upon neighborhood opposition. At least one planning commissioner and one city council member so stated. While the opposition of the community may be given substantial weight, it cannot alone justify a local land use decision. *Parkridge v. City of Seattle*, 89 Wn.2d 454, 462, 573 P.2d 359 (1978); *Maranatha Mining, Inc. v. Pierce County*, 59 Wn. App. 795, 805, 801 P.2d 985 (1990); *Kenart & Assocs. v. Skagit County*, 37 Wn. App. 295, 303, 680 P.2d 439, *review denied,* 101 Wn.2d 1021 (1984). Therefore, we hold the City's action in denying the permit was not based on competent and substantial evidence as required by RCW 7.16.120.

In conclusion, the City of Pasco's denial of Sunderland's special use permit application does not violate the WHPA because the record reveals only that the children to be served are abused and neglected, not emotionally disturbed. However, the City's denial was improper because it was not supported by the record.

■ The question then becomes the appropriate remedy. This court has in some circumstances remanded with direction to grant the land use permit at issue. *See, e.g., Levine v. Jefferson County*, 116 Wn.2d 575, 582, 807 P.2d 363 (1991); *Nagatani Bros., Inc. v. Skagit County Bd. of Comm'rs*, 108 Wn.2d 477, 483, 739 Wn.2d 696 (1987). However, the ordinary remedy is remand for reconsideration. *See Levine*, 116 Wn.2d at 582-83 (Brachtenbach, J., concurring). Reconsideration is especially appropriate where, as here, neither Sunderland nor the City created a record which would support its argument. In addition, because of Sunderland's loss of its original funding, some of the facts to be considered may have changed since the original decision.

We therefore remand this case to the City of Pasco for further proceedings consistent with this opinion.

DOLLIVER, SMITH, ALEXANDER, and TALMADGE, JJ., and UTTER, J. Pro Tem., concur.

DURHAM, C.J. (dissenting) — The majority's discussion of the standards a local legislative body must follow when granting or denying special use permits is altogether erroneous. Moreover, it is dicta because the Pasco City Council heeded appropriate standards when it denied Sunderland Family Treatment Services a special use permit. Of even greater concern, the majority does not exhibit any deference when examining the Pasco City Council's fact-finding. Under RCW 7.16.120, this Court reviews a local legislative body's fact-finding for substantial evidence. This is a highly deferential standard of review. I find, at the very least, substantial evidence in the record support-

ing the Pasco City Council's findings of fact. The majority, in contrast, tacitly ignores the substantial evidence standard, and requires the Pasco City Council to hold yet another round of public hearings where it once again will have to review Sunderland's application for a special use permit. The majority demonstrates complete disregard for the needless waste of time and energy the Pasco City Council must expend to comply with today's decision. I dissent.

When a local legislative body authorizes an administrative planning board to review applications for special use permits, it must provide standards to guide the planning board's decision. 3 Robert M. Anderson, *American Law of Zoning* § 21.09 at 647 (3d ed. 1986); 3 Arden H. Rathkopf et al., *Law of Zoning and Planning* § 41.10 (4th ed. 1994). *See Rody v. Hollis*, 81 Wn.2d 88, 91, 500 P.2d 97 (1972) ("It is the rule in this state that legislative power may not be delegated to an administrative agency without the prescription of reasonable standards."). Without standards embodying a legislative directive, an administrative board would have unbridled discretion when reviewing applications for special use permits.

Of course, a legislative body may retain rather than delegate the authority to issue or deny special use permits. A legislative body acts in a quasi-judicial capacity when it directly reviews applications for special use permits. *State ex rel. Standard Mining & Dev. Corp. v. Auburn*, 82 Wn.2d 321, 327, 510 P.2d 647 (1973); *Pentagram Corp. v. City of Seattle*, 28 Wn. App. 219, 225-27, 622 P.2d 892 (1981). As a result, most courts insist that standards guide the decision. 3 Anderson, *supra* at 659-64.[7] Where a legislative body reviews an administrative board's decision to issue or deny a special use permit, some courts have required

---

[7]The majority incorrectly asserts that most jurisdictions "require the municipal legislative authority to adopt *specific* standards" for denying a special use permit. Majority at 796 (emphasis mine). In fact, most jurisdictions require *some* standards and of these jurisdictions, most permit very general standards. Richard L. Settle, *Washington Land Use and Environmental Law and Practice* § 2.10(a), at 54 (1983).

the legislative body to follow the same standards as the administrative board. *See, e.g., Naples v. Central Plaza of Naples, Inc.*, 303 So. 2d 423 (Fla. Dist. Ct. App. 1974); *Cole v. City Council of Waynesboro*, 218 Va. 827, 241 S.E.2d 765 (1978).

Very few jurisdictions have found standards unnecessary. 3 Anderson, *supra* at 659. This state is not among them. At the outset of *Standard Mining,* the court acknowledged that a legislative body must follow standards when granting or denying a special use permit. *Standard Mining*, 82 Wn.2d at 327.[8] As one commentator has noted:

> While the precise constitutional or other legal basis for the standards requirement is never disclosed, the court, in *Standard Mining*, suggests that it is necessary to avoid unprincipled and discriminatory decisions in violation of due process and equal protection and to facilitate and confine the scope of judicial review. . . .
>
> Although the Washington courts consistently recite the standards requirement, they seem to follow the national trend of holding general and vague standards sufficient[9] as long as adequate procedural standards govern their application.

Richard L. Settle, *Washington Land Use and Environmental Law and Practice* § 2.10(a), at 54 (1983) (citations omitted).

Since *Standard Mining,* this Court has not addressed the precise constraints on local legislative bodies when granting or denying special use permits. However, in *Pentagram Corp. v. Seattle*, the Court of Appeals confronted this very issue. That case dealt with the construction of a

---

[8]*Standard Mining* held standards unnecessary when a legislative body places *conditions* on the issuance of a special use permit recognizing that written standards cannot address all circumstances. *State ex rel. Standard Mining & Dev. Corp. v. Auburn*, 82 Wn.2d 321, 330-31, 510 P.2d 647 (1973).

[9]The majority erroneously states that "Washington . . . has adopted the minority position and does not require specific standards." Majority at 796-97. Nevertheless, the majority's discussion of the standards requirement is dicta because the Pasco City Council followed standards.

restaurant and meeting facility on the Seattle Space Needle. While the Seattle Building Code did not contain specific standards for the granting of special use permits, it permitted "the City Council to attach special conditions relating to the protection of life, property and public welfare." *Pentagram*, 28 Wn. App. at 226. The Court of Appeals found that "[g]iven the uniqueness of structures contemplated by the ordinance, these standards are as specific as is practical." *Pentagram*, 28 Wn. App. at 226.

In *Pentagram*, the Seattle Superintendent of Buildings provided the Seattle City Council with a proposed resolution in favor of granting Pentagram a special use permit. The City Council voted against the resolution but did not enter findings of fact supporting its decision. *Pentagram*, 28 Wn. App. at 221-22. Since a local legislative body acts in a quasi-judicial capacity when granting or denying special use permits, the Court of Appeals held it must enter written findings of fact to avoid violating due process. *Pentagram*, 28 Wn. App. at 229.

After *Pentagram*, the certiorari statute was amended. The amended statute directed the court to review fact-finding under a substantial evidence standard of review.[10] RCW 7.16.120(5). Substantial evidence entails a relatively low threshold of proof and exists when "there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.'" *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 34, 891 P.2d 29 (1995) (quoting *State v. Maxfield*, 125 Wn.2d 378, 385, 886 P.2d 123 (1994)). Under the substantial evidence standard of review, the reviewing court defers to the fact-finder's assessment of witness credibility. *Id.* at 34.

In the present case, the Pasco City Council has delegated to an administrative planning board, the Pasco Planning

---

[10]Following oral argument in this case, legislation was enacted "reform[ing] the process for judicial review of land use decisions made by local jurisdictions . . . ." Laws of 1995, ch. 347, § 702. The new land use petition act, however, retains the substantial evidence standard of review. Laws of 1995, ch. 347, §§ 701, 704, 714(1)(c).

Commission, authority to evaluate applications for special use permits. Pasco Municipal Code (PMC) 22.80.050-.070. Applicants may appeal the Planning Commission's decision to the City Council. PMC 22.80.080. The Pasco Municipal Code directs the Planning Commission to make findings of fact in light of specific standards. The Planning Commission must consider whether:

(1) The location and size of the proposed use, the nature and intensity of the operations involved, and the size of the site in relation to the proposed use and the location of the site in relation to the existing and future streets giving access to it, will be such that it will be in harmony with the orderly development of the district;

(2) The location and height of proposed structures and the site design will discourage the appropriate development of adjacent land and buildings or impair the value thereof;

(3) The operations in connection with the proposal will be more objectionable to nearby properties by reason of noise, fumes, vibrations, or flashing lights than would be the operation of any permitted uses.

PMC 22.80.060. These standards reflect three general concerns: neighborhood harmony, property value, and public welfare. Municipalities commonly rely on one of these standards, or a combination of all three, when evaluating applications for special use permits. *See* 3 Anderson, *supra* at 668-95.

It appears that the Planning Commission may not have considered in full detail all of the above standards when evaluating Sunderland's application for a group home for troubled youth. *See* Return of Writ at 116-17. Nevertheless, the Planning Commission explicitly denied Sunderland's request for a special use permit because surrounding structures contained single-family residences and many elderly lived near the proposed group home. It found the group home too small for its intended use and concluded the group home would be better located in another neighborhood.

Sunderland appealed to the City Council. The City Council conducted a public hearing and made findings of fact. Its findings parallel the standards established to aid the Planning Commission. The City Council found that the group home would not be in harmony with the surrounding neighborhood,[11] would impair property values,[12] and would have a negative impact on the public welfare.[13]

The majority fails to apply the required deference when reviewing these findings. Instead, it simply declares that substantial evidence does not support most of the City Council's findings. Majority at 793-95. The record plainly does not sustain this position. The only finding of fact unsupported by substantial evidence is the City Council's contention that the group home would lower property values.[14] However, the City Council heard ample testimony suggesting that the group home would disrupt the harmony of the surrounding neighborhood, and could, in fact, result in nuisance activity and public safety concerns.

Substantial evidence supports the City Council's findings that the group home is not in keeping with the character of the neighborhood. The neighborhood surrounding the group home is family-friendly. Many of its residents have lived there for over thirty years. In addition to many elderly persons in the neighborhood, there are numerous young families with children. The neighborhood is almost entirely residential and is comprised of

---

[11]Finding of fact 1 states that the location and size of the group home, along with the intensity of its proposed operations, were not harmonious with the neighborhood's residential makeup. Finding of fact 2 states that eight youths, ages twelve to seventeen, would live on a temporary basis in the group home which would be located near single family residences comprised of many elderly persons and young children. Finding of fact 5 states that the group home would be better situated in a less residential neighborhood. Return of Writ at 186.

[12]Finding of fact 3 states that the group home would impair the value of the adjacent properties. Return of Writ at 186.

[13]Finding of fact 4 states that the group home would likely cause security concerns, objectionable noise, and nuisance activity. Return of Writ at 186.

[14]There is no evidence in the record from real estate agents or other professionals that indicates the likelihood of property values diminishing as a result of the group home.

single-family residences and apartment buildings with single-family units. The residents are long-term, and the neighborhood is stable. In contrast, the group home offers short-term, temporary housing for troubled youth for the purpose of on-site extensive counseling. Thus, the group home deviates significantly from the character of the neighborhood.

Moreover, substantial evidence supports the City Council's findings that the group home could lead to nuisance activity and have a negative impact on the public welfare. Eight foster children, who had been "physically, mentally and emotionally abused, or otherwise neglected by their natural parents and families," would reside in the group home. Resp't's Br. (Sunderland) at 3-4. The youths would range from ages twelve to seventeen. The group home raised concerns for personal safety among elderly persons and parents in the neighborhood. A resident employed at a county juvenile facility testified there have been problems with youths running away from group home facilities and then burglarizing nearby homes in order to sell the stolen items for quick cash. Return of Writ at 154-55. In addition, involuntary nighttime placements at the group home would be permissible under local law, causing possible noise and other disruption in the community at late hours, thereby diminishing the residents' quality of life.

Because the majority apparently finds the group home a worthwhile project, it wishes to substitute its judgment for that of the City Council. That is not our proper role under the substantial evidence standard of review. Three standards guided the City Council's evaluation of Sunderland's request for a special use permit to operate a group home for troubled youths. Would it be in harmony with the character of the neighborhood? Would it impair property values? Would it hinder the public welfare? The City Council could have based its decision on any one of these three standards. It chose all three. Substantial evidence supported the City Council's findings that the group home

would disrupt the harmony of the neighborhood *and* would have a negative impact on the public welfare. Given these findings, and the substantial evidence supporting them, I would uphold the City Council's decision to deny Sunderland a special use permit.

MADSEN, J. (concurring in the dissent) — The majority goes awry in its analysis either because it failed to read the Pasco Municipal Code (PMC) or because it misreads this court's decision in *State ex rel. Standard Mining & Dev. Corp. v. Auburn*, 82 Wn.2d 321, 510 P.2d 647 (1973). Whatever the source of confusion, the majority erroneously places the burden on the City of Pasco to justify its permit denial—an error which results in an improper reversal and remand.

The majority justifies its burden shifting because it says that the City of Pasco has *no* standards for approving or denying special use permits. This is exceedingly odd in light of PMC 22.80.060 which sets out *specific* standards for evaluating special use permits. *See* Dissent at 802. Either the majority simply failed to read the PMC, or it believes these specific standards are somehow irrelevant. Assuming the latter, a review of our decision in *Standard Mining* highlights, to the contrary, the significance of the guidelines of PMC 22.80.060.

In *Standard Mining*, the City of Auburn issued a special use permit which included several conditions. The property owner petitioned for a writ of certiorari to review the imposition of conditions, arguing that the permit requirement was invalid because the City ordinance itself did not specify standards to guide the Planning Commission and City Council in determining what conditions to impose. *Standard Mining*, 82 Wn.2d at 323. The trial court agreed and the City appealed. This court reversed, holding that specific standards relating to imposition of conditions are unnecessary if general standards, such as those contained in a comprehensive plan, indicate the purpose underlying the requirement of the special use permit. *Standard Mining*, 82 Wn.2d at 330.

In the case before us the City of Pasco has included specific considerations within its municipal code. Although they are directed toward the Planning Commission's decision, the standards, nevertheless, reflect the City's requirements for issuance of special use permits. In a departure from *Standard Mining*, the majority here apparently now requires that the City duplicate these standards and explicitly specify that they also apply to the City Council's review of the Planning Commission's initial determination. This view not only fails to recognize the general rule "that zoning ordinances should be liberally construed to accomplish their plain purpose and intent" but also assumes the City Council violated the purpose and intent manifest in the code. *Standard Mining*, 82 Wn.2d at 326.

Even more persuasive evidence that the majority errs is the fact that Sunderland does not argue that the City lacks appropriate standards. Rather, as the majority itself recognizes, Sunderland only argues that the City's findings of fact are not supported by substantial evidence. Surely, if the City truly lacked any standards, the question before this court would be whether the permit denial was arbitrary and capricious and not whether substantial evidence supported the findings of fact. *See Standard Mining*, 82 Wn.2d at 327 n.3.

In the end, whether the permit denial in this case was proper or not is unimportant because Sunderland lost the funding for its proposed group home and it now has another use in mind. My concern, therefore, is not with the result but with the flawed analysis which erroneously places the burden of proof on the City in the face of specific standards contained in its code.

Guy, J., concurs with Madsen, J.