STATE OF VERMONT
ENVIRONMENTAL COURT

|                          | } |                           |
|--------------------------|---|---------------------------|
| **In re Appeal of Union Bank** | } | **Docket No. 299-12-06 Vtec** |
|                          | } |                           |

## Decision on the Merits

In its effort to become more compliant with the federal American with Disabilities Act ("ADA"), Union Bank ("Bank") sought the necessary approvals to install an access ramp on its branch bank in the historic Railroad Street area of downtown St. Johnsbury. When the Town of St. Johnsbury Development Review Board ("DRB") denied the Bank's application for site plan approval for its access ramp, the Bank filed a timely appeal with this Court.

The Bank is represented in these proceedings by Robert A. Gensburg, Esq.; the Town was initially represented by Edward R. Zuccaro, Esq., and thereafter represented by Robert T. Gaston, Esq.

The parties advised the Court that, because of the implication of the ADA, the pending appeal presented a unique legal issue; something beyond the scope of the common site plan application. The Court thereafter rendered its December 5, 2007 Interim Decision on the Town's motion for partial summary judgment ("Interim Decision"), in which we concluded that the ADA required the DRB in the first instance, and this Court on appeal, to determine whether "reasonable modification" needed to be made in the application of the Town of St. Johnsbury Zoning & Subdivision Bylaws ("Bylaws"). Id. at 7–8. We concluded that the burden remained on the Bank, as the applicant, to show conformance of its proposed ramp addition with the applicable provisions of the Bylaws, and that a "reasonable modification" of the Bylaws pursuant to the ADA was only authorized after a showing that compliance "with the ADA necessitates non-compliance with specific provisions of the Bylaws." Id. at 7. The matter thereafter proceeded to trial.

## Findings of Fact

Based upon the evidence admitted at trial, including that which was put into context by the site visit that the Court conducted with the parties and after the Court has made its assessment of the credibility and weight that should be afforded to such evidence, the Court renders the following Findings of Fact:

1. Union Bank, a Vermont-chartered banking institution, owns what is known locally as the former Citizens Bank building ("Building") at the corner of 364 Railroad Street and Eastern Avenue in the Town of St. Johnsbury. Citizens Savings Bank and Trust was merged into Union Bank several years prior to the pending zoning application.

2. The Building is located in both the Commercial Zoning District and Design Control District. It is also listed as a "contributing building" to the applicable portion of the National Register Historic District.

3. The Building was designed by the Nineteenth Century architect Lambert Packard and was constructed in 1893. On Railroad Street, the Building rises to a height of four stories. Eastern Avenue slopes downward as it travels away from Railroad Street, such that the Building contains five stories on its Eastern Avenue side.

4. The entire first floor, fronting on Railroad Street, consists of the Bank's principal St. Johnsbury office, including a customer lobby, teller facilities, loan offices, safe deposit boxes, a vault, administrative offices, an ATM, and a board room. The second and third floors are used as professional and business offices by tenants. The fourth floor is vacant.

5. The primary entrance to the Bank is located on Railroad Street; this entrance consists of three granite risers (types of steps) with double doors that open and close in the middle and swing out onto the top riser. The first riser, on street level, is three and one-half inches high, the second riser is seven inches high, and the third riser is seven and one-half inches high. Access to the Bank's ATM is through a similar but separate entrance on Railroad Street. There are two flights of stairs inside the ATM entrance that lead to the professional and business offices on the second and third floors.

6. Due to these granite steps and grade changes, there is no wheelchair access to the Building off Railroad Street. Inside the Building, there is no wheelchair access to the second, third, or fourth floors. Wheelchair-bound Bank customers are often required to conduct their banking transactions out on the street, with the help of Bank employees.

7. The granite steps on Railroad Street contribute to a less-than-safe or ideal entrance for Bank customers, several of whom (including customers not deemed to be disabled) have been injured while attempting to enter the Bank. These steps can be treacherous in inclement weather. On more than a few occasions, individuals have slipped on the steps or been hit by the outward-swinging doors as they close.

2

8.     The basement floor of the Building, which fronts on Eastern Avenue, is accessible by wheelchair, but there is no interior wheelchair access from the basement to the rest of the Building.  There is one handicapped parking space near this Eastern Avenue entrance.  This basement area is currently leased out by the Bank to a separate, non-affiliated business.

9.     Because of the slope of the sidewalk along Eastern Avenue, wheelchair access is not ideal at this location and—depending upon the road and sidewalk traffic—can be difficult.

10.     Before the Bank leased out the basement space accessed from Eastern Avenue, it used to allow disabled Bank customers to conduct their banking transactions in one of the basement offices.  Bank employees would meet with the Bank customers in the basement and then complete the customer's banking transactions by returning to the Bank lobby, above the basement.  The Bank hopes to install the access ramp so that its disabled customers can conduct their banking transactions in the same space and in the same manner as other members of the general public, and not in a separate, segregated space in the basement.

11.     Intending to increase the handicapped accessibility to the Building, the Bank applied to the St. Johnsbury DRB for site plan approval to construct a ramp on Railroad Street to the primary entrance of the Bank on the first floor.  The Bank also plans to install an elevator inside the Bank lobby on the first floor of Railroad Street, so that the second, third, and fourth floors will be accessible to physically disabled visitors.[1]

12.     The proposed ramp on Railroad Street is to be twenty-eight feet long and four feet, five inches wide.  The Bank owns the sidewalk on which the ramp will be constructed.

13.     In 1984, the Bank conveyed an easement over the sidewalk to the Town for pedestrian and utility purposes, subject to the right of the Bank to construct its own improvements along the sidewalk, once it received approval from the Town.

14.     The Town Selectboard approved the construction of the proposed ramp within the easement-encumbered sidewalk, subject to approval by the Town's Highway and Water Departments.  The Water Department has given that approval; the Highway Department has not responded to the Bank's request.

15.     The State Division of Historic Preservation reviewed the ramp proposal and approved it, subject to conditions that the Bank has incorporated into the revised design that was in turn incorporated into the plans the Bank submitted at trial.

---

[1]  The plan to install an elevator is _not_ a component of the pending application.

16. The Bank disclosed at trial that even if it narrowed the proposed ramp by five inches to the allowable minimum width of four feet for wheelchair accessibility, it would still be less than twenty feet from the limits of its front boundary line.[2] The proposed ramp would, however, be more than five feet from the front boundary line and therefore could be allowed as a conditional use, pursuant to Bylaws § 205.2.6.

17. So as to allow access to the Town utilities that are installed underneath the existing sidewalk, in accord with the Bank easement noted in paragraph 13 above, the proposed access ramp has been designed so that it may be temporarily removed from the sidewalk when needed to allow access to these utilities. The proposed access ramp may then be reused and put back in place, once the Town completes any future utility work.

18. The proposed access ramp will also be heated, so as to remove snow and ice during the colder months. The Bank's expert provided credible testimony that much of the melted snow and ice would evaporate. Any water run-off from the snow and ice melt will be directed away from the remaining sidewalk. The Bank pledges to take all remedial steps necessary to avoid water run-off and freezing that could contribute to safety concerns for pedestrians and others.

19. The Town uses a five-foot wide sidewalk plow to maintain cleared paths on its sidewalks. Once the proposed sidewalk is installed, the remaining portion of the sidewalk in front of the Bank will be six to seven feet wide, thereby allowing the sidewalk plow to pass.

20. In connection with the installation of the proposed access ramp, the Bank intends to install wall sconce lights on either side of the Railroad Street entrance. The proposed lighting will be in keeping with the historic character of the Building. The proposed lighting is shown in the depictions shown on Exhibit 10.

21. The Bank thereafter investigated alternatives to the proposed ramp. It directed its architect and engineer to develop, design, and provide preliminary cost estimates for such alternatives. The Bank consultants determined that there were three possible alternatives to the proposed sidewalk: (1) an interior ramp within the Bank's Railroad Street entrance, requiring removing and replacing interior floor joists; (2) an interior ramp at the current ATM entrance, also requiring removal and replacement of interior floor joists; and (3) an interior lift at the ATM

---

[2] The Bank's property boundary extends beyond the full width of the Railroad Street sidewalk and about one-and-a-half feet into the Street. Evidence at trial did not reveal the specific distance between the front of the Building and the Railroad Street boundary of the Bank's property, but the suggestion was between ten to twelve feet.

entrance site. Both of the latter two options would require Bank customers to pass through what are now restricted hallways for Bank employees.

22.    The Bank's architect provided credible evidence that these alternatives would require prohibitively expensive renovations to the Building, would necessitate realignment of internal hallways for Bank employee operations, and might also necessitate retro-fitting for building code compliance of this historic structure.

## Discussion

Currently before the Court is the Bank's application for site plan approval of its proposed access ramp addition to its pre-existing Building at the corner of Railroad Street and Eastern Avenue. This application is governed by the Special Provisions Article of the Bylaws (Article IV), specifically §§ 401 (governing site plan approval) and 402 (providing for additional review of property development within the Design Control District). The Bank Building is within the Design Control District. Bylaws § 402.1.[3]

Before we embark upon our analysis of the proposed ramp's conformance to Bylaws §§ 401 and 402, we note that the Bank also presented a new application just prior to the commencement of trial, seeking conditional use approval for the proposed access ramp. The Bank explained that in its review of the front-yard setback requirements, it discovered that its proposed ramp may also require conditional use approval, pursuant to Bylaws § 205.2.6. Since this application has not yet been presented to the DRB in the first instance for public notice, hearing, and review, we decline to review this application in the first instance. Were we to take on the task of reviewing this application in the first instance, we would violate the limits of our jurisdiction, as articulated by the Supreme Court in In re Torres, 154 Vt. 233 (1990), and its progeny.

The basic premise of the Torres doctrine is that this Court's jurisdiction over municipal appeals is "limited to consideration of the matters properly warned before the local board." In re Maple Tree Place, 156 Vt. 494, 500 (1991). Further, we are advised to "resist the impulse to view [this Court] as a super planning commission." Chioffi v. Winooski Zoning Bd., 151 Vt. 9, 13 (1989). We have observed that when this Court embarks upon a review of a municipal land

---

[3]  The Bank's revised Statement of Questions, six in number, reference the verbiage, although not the specific subsections of Bylaws §§ 401 and 402. Review of the application of these provisions is therefore within our jurisdictional authority in this appeal. V.R.E.C.P. 5(f).

use application that has not first been considered by the appropriate municipal panel, the consequence is reversal and remand. Simendinger v. City of Barre, 171 Vt. 648, 654 (2001)(mem.). We do not intend to violate this bright-line demarcation of our jurisdictional limits in this appeal. We therefore limit our review to the site plan application that was presented to the DRB below.

## I.  Conformance to Site Plan Standards

As to the Bank's request for site plan approval for its proposed access ramp, we turn first to Bylaws § 401.2, which requires conformance with the following standards:

(a) Maximum safety of vehicular circulation between the site and the adjacent street network.

(b) Adequacy of circulation, parking and loading facilities with particular attention to safety.

(c) Adequacy of landscaping, screening and setbacks in regard to achieving maximum compatibility and protection of adjacent property.

(d) Utilization of renewable energy resources.

(e) Adequacy of storm water drainage and run off including freedom from flooding and ponding.

Our review of the § 401.2 standards is brief, due to the nature of the proposed development. The access ramp addition is a minor accessory structure to a well-established banking facility in the heart of downtown St. Johnsbury. There has been no suggestion that the proposed access ramp will have any impact upon vehicular circulation, and we find no evidence of such an impact. Similarly, there has been no suggestion that an access ramp is significant enough of a structure to warrant consideration of renewable energy resources or that such a structure will make any measurable contributions to stormwater runoff. Thus, we find conformance with subsections (a), (d), and (e).

Subsections (b) and (c) offer the basis of the most significant dispute in these proceedings. The principal concerns raised at trial were: (1) the narrowing of the remaining sidewalk and resultant impact upon pedestrian circulation in front of the Bank; (2) the adequacy of the front yard setback; and (3) the adequacy of the ramp's design and compatibility with adjacent properties.

There was no suggestion that the proposed ramp would have an impact upon parking or loading facilities, nor was there any suggestion that further site landscaping or screening were

warranted for this downtown location. We therefore need not further address those portions of Bylaws §§ 401.2(b) and (c).

### 1) Does the narrowing of the sidewalk cause safety or other concerns?

The existing sidewalk in front of the Bank Building is eleven-and-a-half to twelve feet in width, with a larger area directly in front of the Bank's Railroad Street entrance, where the sidewalk includes a "bulb out" at the crossing with Eastern Avenue. Once the ramp is installed, the remaining sidewalk will be up to seven feet wide (not including the bulb out) for the twenty-eight feet in length of the ramp, which we consider to be sufficient width for two adults to comfortably traverse side-by-side. Further, the ramp usage will not be restricted to the disabled or Bank customers only; it will be available to all of the general public. With these attributes, we conclude that the proposed ramp will allow for adequate circulation and will not provide for increased safety risks.

### 2) Is the remaining setback adequate?

As noted in the immediately preceding paragraph, we conclude that the remaining sidewalk and availability of the ramp for use by the general public provides for adequate circulation in the area in front of the Bank Building. Particularly when we take into consideration the purpose and need of this proposed ramp (as discussed in more detail below), the design of the proposed ramp achieves maximum compatibility and protection of the Bank Building and adjacent properties.

### 3) Is the proposed ramp compatible and protective of adjacent properties?

Subsection (c) seeks a determination on the compatibility of the ramp's design with adjacent properties. We include a more detailed assessment of the proposed ramp's aesthetic impacts in our discussion of § 402.2 conformance, below. For purposes of conformance with § 401.2(c), we note that the materials to be employed in the ramp's construction, including those suggested by the State Division of Historic Preservation, all of which the Bank has incorporated into its revised design, blend the ramp well into the façade of the Bank Building and surrounding properties. The best support of our conclusion here is a comparison of the "Before" and "After" renderings found in Exhibits 9 and 10. Furthermore, the addition of the ramp, with a design compatible with the bank Building, provides an equal welcome to disabled individuals and other members of the general public; it announces that its public facility is barrier-free to all.

For all these reasons, we therefore conclude that the proposed ramp conforms to Bylaws § 401.2.

## II.   Conformance to Design Control Standards

We next turn to the question of whether the proposed access ramp conforms to the applicable provisions of the Design Control District.  Those provisions establish the following standards in Bylaws § 402.2:

(a) Preservation or reconstruction of historic style and intended use.

(b) Harmony of exterior design with other properties in the neighborhood.

(c) Compatibility of the exterior materials and color schemes to be used with other properties in the neighborhood.

(d) Full landscaping shall be maintained between the building's facade and the street, and parking shall not be created in this area.

(e) Compatibility of the proposed landscaping and screening with other properties in the neighborhood.

(f) Location and appearance of all utilities, including lighting.

(g) Compatibility with uses of neighboring properties.

We've noted above in our discussion of the ramp's conformance to Bylaws § 401.2 that landscaping and screening are not at issue in this application.  Similarly, the proposed ramp will not have an impact upon adjacent utilities.  In fact, the Bank has designed the ramp so that it may be temporarily removed to accommodate Town utilities buried beneath the Bank sidewalk.

The sole remaining concern addresses all remaining sub-criteria of Bylaws § 402.2: does the design of the proposed ramp adequately preserve the historic style and is it compatible and in harmony with the historic Bank Building and its surrounding properties.  In this regard, we include by reference our earlier discussion of compatibility under § 401.2(c).  We further note that, even within the context that the ADA renders the proposed ramp or its alternative a necessity, the design of the proposed ramp complements the area by reinforcing the notion that all members of the general public are welcome.

Testimony at trial revealed that the Town and its witnesses sincerely seek to preserve the important historical nature of this District.  But the premise that an access ramp detracts from this historical area is simply without foundation in the record before us.[4]  The ramp design pays

---

[4]  Although an accessibility ramp might seem out of character with the historical time period preserved in this area, we cannot give credence to the idea that we should absolutely preserve an entrance on this public building that

due respect to the materials and color tones already employed on the façade of the Bank and surrounding buildings. For this and other stated reasons, we conclude that the proposed ramp, as designed, complements and does not detract from its historical surroundings.

Having found that the ramp as proposed conforms to Bylaws §§ 401.2 and 402.2, we are left with the question of what "reasonable modification," if any, the ADA requires of the DRB in the first instance and this Court on appeal. We discussed this issue in our Interim Decision, specifically at pages 5–7. In this regard, we note that the only remaining non-conformance to the Bylaws is the fact that the ramp is to be located within the twenty-foot front yard setback required of permitted uses in the Commercial Zoning District. See Bylaws Table 204.7.

As previously discussed in our Interim Decision, while the Vermont Supreme Court does not appear to have addressed this specific legal question, our federal court of appeals has affirmed a district court conclusion that zoning determinations fall within the ADA directive that "public entities [must] make reasonable modifications to their policies, practices, and procedures, where such modifications are necessary to avoid discrimination on the basis of disability." Innovative Health Systems, Inc. v. City of White Plains, 931 F. Supp. 222, 232–33 (S.D.N.Y. 1996), aff'd in part, 117 F.3d 37 (2d Cir. 1997) (citing 28 C.F.R. § 35.130(b)(7)). To accommodate the Bank's effort to approach conformance with ADA requirements, the implementation of the Bylaws must only be modified in what we regard to be a minor way: allowance of an access ramp as narrow as four feet in width, which can be temporarily removed when needed to access Town utilities. The ADA modifications are further minimized by the successful design of a ramp that integrates well with the historical district in general and the Bank Building and its abutters in particular, including the adjoining railroad station across Eastern Avenue—a station that includes an access ramp. To the Town's expressed fear that the Bank's proposed access ramp will encourage multiple ramps to be installed by the commercial property owners along Railroad Street, we find no material foundation for this concern, since most of those properties already include grade-level entrances. To the extent that application of the Bylaws prohibits the proposed ramp due to its location within the front yard setback, we

---

prohibits use by a material segment of the general public, just as we would not allow the preservation of the "whites only" signs that once graced historic buildings in other sections of our country. Cf., e.g., Sunderland Family Treatment Servs. v. City of Pasco, 903 P.2d 986, 993 (Wash. 1995) (noting that unsubstantiated fears and biases cannot justify zoning restrictions).

conclude that the Supremacy Clause of Article VI of the United States Constitution requires the application of the "reasonable modifications" provisions of the ADA.

### Conclusion

Accordingly, based on the foregoing, we hereby conclude that the access ramp proposed by Union Bank, if constructed and maintained as represented at trial, conforms to Bylaws §§ 401.2 and 402.2 and is therefore entitled to site plan approval, subject to the following conditions:

1) The Bank shall revise its site plans to incorporate all recommendations suggested by the State Division of Historic Preservation.

2) The access ramp design shall be revised and its construction completed to incorporate the narrowest width to accommodate wheelchair access and conformance with the federal American with Disabilities Act.

3) The Bank shall produce revised site plans and submit such plans to the Town Zoning Administrator. The proposed access ramp shall be constructed and maintained as represented in these revised site plans.

4) In the event water produced by the ramp's heated base causes ice build up or other dangerous conditions on the adjacent sidewalk and street, the Bank shall rectify this condition.

A Judgment Order accompanies this Merits Decision. This concludes the proceedings before this Court in this appeal.

Done at Newfane, Vermont, this 10th day of April 2009.

_____
Thomas S. Durkin, Environmental Judge

10